STATE ex rel. ROTH, Trustee, v. WATERFIELD, Court Clerk.

No. 24650.    Oct. 17, 1933.

Rehearing Denied Jan. 23, 1934.

Dissenting Opinion Jan. 26, 1934.

Arden E. Ross, Massingale, Duff & Manatt, and Kleinschmidt & Johnson, for plaintiff in error.

Holly L. Anderson, Co. Atty., (Albert H. Bell, Yancy, Spillers & Brown, Hess Crossland, Orr & Rust, Hunt & Eagleton, and William H. Martin, of counsel), for defendant in error E. A. Waterfield.

Maris & Maris, Chas. West, and Conner & Conner, amici curiae.

BUSBY, J. This appeal is perfected from a decision of the district court of Tulsa county refusing to issue a writ of mandamus to compel the court clerk of that county to issue a summons in a mortgage foreclosure action.

The parties appear in this court in the order of their appearance in the trial court, and will be referred to as plaintiff and defendant, respectively.

The mortgage foreclosure action was filed in the district court of Tulsa county on April 27, 1933. Plaintiff's petition was accompanied by a praecipe for summons requesting that the court clerk issue summons requiring the defendants to answer 20 days after the return date. The clerk of the court refused to issue summons in accordance with the praecipe, asserting that the return day should be fixed at 9 months from date of service. The plaintiff then applied to the district court of Tulsa county for a writ of mandamus to compel the defendant court clerk to issue a summons in the form requested by the praecipe. The defendant in his response urged that his refusal to act was justified by the provisions of Senate Bill No. 76 of the Fourteenth Legislature, commonly known as the "Mortgage Moratorium Act" (Sess. Laws 1933, ch. 16). This act the plaintiff said was unconstitutional.

The decision of the trial court refusing to issue the writ declared section 1 of the act free from constitutional objections.

Several cases involving this legislative enactment are now before this court. They have been considered together and the briefs filed in all of them have been consulted in arriving at the conclusions herein announced.

The only questions involved relate to constitutional law. If section 1 of the act is valid, the defendant should prevail. If invalid, the writ should issue as requested by the plaintiff.

The act in question provides:

"Section 1. In all actions now pending in the courts of this state, for the foreclosure of mortgages or other liens upon real estate, where the answer of the defendant or defendants has not been filed, such defendant or defendants shall not be held to answer therein until the expiration of nine (9) months after the date of the service of summons upon the defendant who is the record owner of the real estate, at the time of the filing of suit upon which the mortgage or other lien is sought to be foreclosed, and

"In all actions hereafter filed in the courts of this state for the foreclosure of mortgages or other liens upon real estate, the defendant or defendants shall not be held to answer therein until the expiration

of nine (9) months after the date of the service of summons upon the defendant who is the record owner of the property at the time of the filing of suit upon which the mortgage or other lien is sought to be foreclosed. and

"In all actions now pending in the courts of the state, for the foreclosure of mortgages or other liens upon real estate, in which the answer of defendant or defendants has already been filed, no trial shall be had, and no court of this state shall render judgment therein, until the expiration of nine (9) months after the passage and approval of this act, upon which the mortgage or other lien is sought to be foreclosed.

"Section 2. For a period of two (2) years from and after the approval of this act, the district judge, or the judge of the superior court of the county in which any real estate mortgage foreclosure of a deed of trust, or other instrument, the security of which is real estate, is hereby vested with the jurisdiction and discretion of granting a continuance of said cause, upon his own motion, or upon application of the owner of said property, in person, or by his attorney, and upon such terms and for such time as said judge may deem best.

"Section 3. The judge of said court shall continue said cause for such time as he may deem best, or when it may be made to appear to the court that:

"(First), The owner shall pay, at any time before confirmation of sale, the accruing interest and all taxes due upon said property; or:

"(Second), At any time before confirmation of sale. where the said owner shall pay or cause to be secured, a reasonable rental for the time or term which said judge shall order said cause to be continued: or:

"(Third), At any time before confirmation of sale, where it shall appear that the value of the property is sufficient to satisfy the lien, together with the cost, and the owner shall pay or otherwise secure the taxes due upon said land.

"Section 4. The court or judge of the district or superior courts or (sic) said state may appoint a receiver of said property. except when the same may be a homestead. to preserve, rent and operate said property, or to prevent waste. where the occupant thereof is wilfully injuring or destroying the improvements on any property sought to be foreclosed, and apply the receipts as the court may direct, during the time for which said cause is continued.

"Section 5. That whenever the record owner of the real estate. at the time of the passage and approval of this act, shall convey or transfer said property at any time hereafter. or in any way incumber the same

without the written consent of the mortgagee the provisions of this act shall not apply. Provided, further, any attempt to waive or contract in violation of the provisions of this act are void and are without legal effect.

"Section 6. That the provisions of this act shall not operate to affect the liens or remedies to enforce said liens of labor, mechanic's or material lienholders existing upon the passage and approval of this act.

"Section 7. This act shall be and remain in full force and effect for a period of two (2) years, from and after the date of its passage and approval, at the expiration of which time it shall become inoperative and void.

"Section 8. The provisions of this act are severable, and if any clause, sentence. paragraph or section hereof shall be held void, the decision of the court shall not affect or impair any of the remaining portions or provisions of the act.

"Approved March 7. 1933. Emergency."

There are 9 sections contained in the bill, including the emergency clause.

Section 8 provides that the provisions of the act shall be severable, and that if any clause. sentence, paragraph, or section shall be held void, the decision shall not affect or impair any of the remaining portions or provisions of the act.

For the reasons hereinafter set forth. we hold that paragraphs 1, 2, and 3 of section 1 of said act are unconstitutional. We hold all the remaining portions of said act to be valid and constitutional when interpreted and applied as hereinafter set forth.

Let us analyze paragraphs 1, 2, and 3 of section 1 of said act. The first paragraph in effect provides that in all pending foreclosure actions, where the defendant has not answered. he may have nine months after the date of service of summons in which to file said answer. The existing statutes at the time of the execution of the mortgage in question provided for a period of 20 days in which to answer. Senate Bill 76. therefore, adds an extension of 8 months and 10 days for answer. The second paragraph of Senate Bill 76 provides that in foreclosure actions hereafter filed the defendant shall not be held to answer for a period of nine months from date of service of summons. This paragraph has virtually the same effect as the preceding one. The third paragraph provides that in all foreclosure cases pending, where the defendant's answer has already been filed, no trial shall be had and no judgment rendered until the expiration of nine months after the

passage and approval of this act. The effect of these three paragraphs is to extend arbitrarily the term under which the mortgagee may foreclose his mortgage approximately nine months more than the statute provided at the time the contract was made. In other words, this legislative act, in effect, extends the due date of the mortgagor's note and mortgage approximately nine months beyond the contract date to pay.

It should be observed that the case at bar was commenced after Senate Bill No. 76 became effective. The effect of the act upon cases pending at the time it became effective is discussed and disposed of in the case of State ex rel. Osage Savings & Loan Association v. Jesse J. Worten, District Judge, No. 24681, this day decided, 167 Okla. 187, 29 P. (2d) 1. In that case this court, speaking through Mr. Justice Andrews, held that in so far as the act under consideration undertakes to change the procedure in actions pending at the time of its enactment, it directly conflicts with section 54 of article 5 of the state Constitution. The effect of that decision is to totally annul paragraphs 1 and 3 of section 1 because they relate to actions pending at the time the act became effective. It also narrows our discussion to the constitutionality of the act as applied to actions commenced subsequent to the effective date of the act.

Partial invalidity of an act does not necessarily destroy the entire act. It is a familiar rule of law that an act of the Legislature, while invalid and inoperative as to one set of facts, may be constitutional and valid as to another and different state of facts. Consolidated Pipe Line Co. v. British American Oil Co., 163 Okla. 171, 21 P. (2d) 762. It is equally elementary that when an act contains a partial "invalidity clause", such as section 8 of the act in question, and one portion is determined to be invalid, a presumption arises that the Legislature would have enacted the valid portions, omitting the invalid provisions, if the act thus reformed remains operative as a law.

The plaintiff asserts that the remaining sections of the act, and especially paragraph 2 of section 1 of the act, violate the provisions of our Constitutions, state and national, relating to "impairment of the obligations of contract," or equal protection of the laws.

The defendant, while denying that these constitutional provisions are violated, urges that even though offensive to constitutional requirements, the act should be upheld as a fair and reasonable exercise of the police power. The contention of the defendant is that the entire act is justified without restrictive interpretation on the theory that in view of existing economic conditions, it is a just and reasonable exercise of the police powers of the sovereign state. This view embraces the idea that the power, when reasonably exercised by appropriate legislation, is not restricted by constitutional limitations, and may infringe upon rights guaranteed to citizens by specific provisions of our fundamental and basic law. A view is thus expressed which, pursued to its ultimate conclusions, vests in the Legislature the power, in emergency cases, to suspend the Constitution to the extent that that basic document appears to unreasonably restrict their power to legislate. It makes the Legislature the judge, in the first instance, of when such an emergency exists and to what extent it may reasonably go in suspending or overriding constitutional inhibitions.

This seems to be an extremely dangerous doctrine fraught with possibilities which may undermine the very foundation of American democracy.

We are unable to place the stamp of legal approval upon this view, and are firmly convinced that if the act in question is to be sustained in whole or in part, it must be done upon some theory that recognizes the continuing force and effect of constitutional provisions. In other words, only those portions of the act can stand which may be reconciled with the fundamental law of our land as announced in our Constitution.

While Constitutions should be liberally construed in order that the government, state and nation, may properly function, yet clear and express constitutional inhibitions must at all times be recognized by our agencies of government, legislative, executive, and judicial.

If it is the desire of the people that constitutional limitations be removed, a method has been provided in the Constitution itself to accomplish that result by amendment. This is true of both our national and state Constitutions. Of course, even though the necessary majority of the electorate desired to make such a change, it would require an interval of time to accomplish the result. But this in itself is generally conceded to be one of the salutary features of our constitutional form of government. It recognizes the fact that basic principles of government seldom change, and that a sufficient period of deliberation should be afforded before drastic changes in government are effected. This thought

was emphasized by George Washington in his farewell address when he said:

"If in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates. But let there be no change by usurpation for though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed."

What, then, is this power which threatens to break down constitutional restraints imposed by a sovereign? While some courts have undertaken to define the power, most judicial bodies when confronted with the problem of its application have contented themselves with a general statement of its nature. Thus it has been said to extend to all regulations "reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community." Atlantic Coast Line Railway Co. v. City of Goldsboro, 232 U. S. 548, 58 L. Ed. 721.

The decisions of the courts of last resort are filled with references to and discussions of this power, from which volumes might be compiled without exhausting the subject. Generally, in the last analysis, its scope and limitations must be determined by reference to judicial precedent, as is said in 6 R. C. L. p. 185:

"Since the limits of the police power of the state have never been defined with precision, and its boundary line cannot be determined by any general formula in advance, recourse has been had to the gradual process of judicial inclusion and exclusion. This gradual process of determining its limitations is due to the fact that it is easier to perceive and realize the existence of the police power, and to determine whether a particular case comes within the scope of the power, than to give a definition that will be applicable to all cases."

While judicial precedent is the principal light by which our path is illuminated, constitutional requirements must at all times be kept in mind to the end that individual rights may not be unjustly infringed upon. As Cooley on Constitutional Limitations states in his 8th Edition, at page 1233:

"But any accurate statement of the theory upon which the police power rests will render it apparent that a proper exercise of it by the state cannot come in conflict with the provisions of the Constitutions of the United States."

And as stated in 6 R. C. L. 195:

"While there are no precise limits to the police power, it is not, however, without its limitations, since it may not unreasonably invade private rights, or violate those rights which are guaranteed under either federal or state Constitutions."

And again in 6 R. C. L. 191:

"Each state has the power, therefore, to regulate the relative rights and duties of all persons, individuals, and corporations, within its jurisdiction, for the public convenience and the public good. The only limit to its exercise in the enactment of laws is that they shall not prove repugnant to the provisions of the state or national Constitution."

When the exercise of the police power affects existing contracts, how is it to be reconciled with the clauses in the federal and state Constitutions prohibiting the impairment of the obligation of contracts? Section 15 of art. 2 of our state Constitution provides:

"No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed."

Likewise section ten (10) of art. (1) of the Constitution of the United States contains the following:

"No state shall * * * pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility."

What, then, are the obligations of contracts intended to be protected by the constitutional provisions above referred to? Do they refer only to the express terms of the contract? Or is the prohibition deemed to include likewise provisions of the law, including those prescribing procedure which were applicable to the contract at the time of its execution? The answer to these questions is concisely stated in Cooley's Constitutional Limitations (7th Ed.) p. 403:

"The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party, and the right acquired by the other. There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law affect to diminish the duty or to impair the right, it necessarily bears

on the obligation of the contract, in favor of one party, to the injury of the other. * * *"

Thus it appears that the procedural provisions existing in our state statutes at the time of the execution of the mortgage and note in question become, by the application of this rule, in effect a part of the contract, and any attempt to alter the same would be to that extent a change in the terms or obligations of the contract. In the portion of the text above mentioned the author was not considering the police power, nor the right to legislate in the exercise of that power, the fact that this was also a part of the existing law at the time of the execution of the contract. Thus the question is presented (and herein lies the gist of the legal problem involved) in the case at bar: Were not the laws of the state with reference to the police power also a part of the existing law at the time of the execution of the contract? We must answer in the affirmative. For if the procedural provisions of the law become a part of the contract on the theory that they were the existing laws at the time the contract was made, then likewise it would seem to logically follow that the legal provisions concerning the police power would also become a part of the contract. Cooley in his work on Constitutional Limitations (8th Ed.) p. 1237, referring to the police power, states:

"All contracts and all rights, it is declared, are subject to this power; and not only may regulations which affect them be established by the state, but all such regulations must be subject to change from time to time, as the general well-being of the community may require, or as the circumstances may change, or as experience may demonstrate the necessity."

And in 6 R. C. L. page 199, par. 195, in the article on Constitutional law, it is said:

"Hence it is that not all legislation which has the effect of impairing a contract is obnoxious to the constitutional prohibition as to impairment. Familiar instances of this principle are where parties enter into contracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery, all of which are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, that parties, by entering into contracts, may not estop the Legislature from enacting laws intended for the public good. The authority of the Legislature, in the exercise of its police powers, cannot be limited or restricted by the provisions of contracts between individuals or corporations, or between individuals and municipal corporations."

In the case of Marcus Brown Holding Co. v. Feldman. 65 L. Ed. 877 (sometimes referred to as the New York rent case), it was said by the Supreme Court of the United States, referring to this power:

"But contracts are made subject to this exercise of the power of the state when otherwise justified." (Citing authorities.)

And in the case of C., R. I. & P. Ry. Co. v. Taylor, 79 Okla. 142, 192 P. 349, it was said in the syllabus, in referring to the police power:

"* * * All contracts are properly written and approved subject to its fair exercise."

Thus it may be seen that changes in the obligations of contracts may be made when made as a proper exercise of the police power, not because Constitutions may be suspended by police power, but because the right to legislate in the exercise of that power is a part of the existing law of the state at the time of the execution of the contract, and as such enters into the terms and provisions of the contract in the same manner that statutes prescribing procedure become a part of the contract.

It may be said that all property rights, including contracts, are subject to the proper exercise of the police power, and in that respect it is often said that individual rights to property, being subject to the exercise of this power, are qualified as distinguished from absolute.

Having arrived at this conclusion, the question of the constitutionality, in so far as it relates to the clauses concerning the obligation of contracts, now presents the narrower question: Is the subject-matter of the act in question within the proper field of the police power?

It is urged by some writers that our country is now undergoing a mild form of revolution in so far as our governmental tendencies to increase and extend the police power are concerned; that we are seeing only the beginning of the changes that will come to our form of government. This may be true. While our Constitution has been referred to as a real charter of liberty, "the most wonderful work ever struck off at any given time by the brain and purpose of man", still it is not perfect, and will be amended from time to time to meet changing conditions and demands of a fast changing civilization under more complex conditions than its writers ever dreamed of. But these changes must of necessity come slowly in a nation of widely scattered communities, between which there are scattered conflicting economic interests. Legislative

acts in temporary emergencies directly in conflict with the Constitution, state and national, should not be the means of an indirect method of constitutional change. We have long realized that police regulations restricting or prohibiting the sale of intoxicating liquor might be enacted even though existing contracts (perfectly legal at the time of their execution) respecting the sale of those beverages might thereby be impaired or even nullified. Thus, likewise, appropriate legislative acts limiting, regulating or even prohibiting the drilling of oil wells in neighborhoods where a fire hazard might thereby be created, have been upheld by the courts, notwithstanding the effect of such legislation upon existing contracts.

Numerous other illustrations of the unquestionable use of this power might be called to mind. With few exceptions its use has been confined to legislation directly and ostensibly relating to public health, safety, and welfare, and the effect of such legislation upon existing contract was only incidental.

There is a vast difference and a vivid distinction between a police regulation enacted for the obvious purpose of preserving peace, health, or safety, which incidentally affects contracts or property rights on the one hand, and, on the other hand, a law which is directly intended to change or alter contractual relations between individuals in connection with contracts of a class which have never been regarded as affecting the public peace or safety and morals of the community, in the hope that the change of such contractual relations may incidentally improve the economic welfare of the community.

The difficulty in this case is not in reconciling the right of the Legislature to exercise the police power through appropriate legislation with the constitutional provisions respecting the impairment of contracts, for the exercise of that power, as we have said, may be justified on the theory that the right to legislate within the proper field of the police power is a part of the existing law of the land at the time of the execution of the contract, and becomes as such a part of the contract. The real difficulty in this case is the extremely questionable right to extend the police power to the class of contract under consideration.

Undertaking to use the police power to cure economic evils through the enactment of laws which benefit one class of persons by infringement upon the private contractual rights of another, is a dangerous tendency in our law. It finds little judicial sanction and can be justified only in the most extreme cases.

Modern decisions which are said to sanction this form of legislation include the recent case of Blaisdell v. Home Building & Loan Ass'n (Minn.) 249 N. W. 334, wherein a "Moratorum Law" was upheld, and Block v. Hirsh, 65 L. Ed. (U. S.) 865; Brown v. Feldman, supra (rent cases by the Supreme Court of the United States.) The Minnesota case sustained a mortgage foreclosure act which authorized delay in foreclosure proceedings. The rent cases sustained acts which permitted tenants to hold over after their term had expired upon payment of a reasonable rental value. Detailed discussion of these cases will be omitted, since their effect can best be determined by reading the opinions therein.

In each of these cases the acts in question were justified by the court on the theory of an existing emergency. The defendant contends that Senate Bill No. 76 should be sustained on a similar theory because there now exists a great economic emergency, that it is both state and national; that great weight should be given to the act of the Legislature which finds the existence of such an emergency and which attempts relief thereof; that members of the Legislature come from every community of the state and from all walks of life and are familiar with conditions generally; that they have recognized the fact that thousands of people may lose their homes by reason of foreclosure, causing widespread want and suffering among the people. and that the provisions of the act are not unreasonable or arbitrary, and are not an unreasonable application of the police power reserved by the state.

We all must and do recognize the existence of this national economic emergency, or depression, which has prevailed throughout this nation for the past three years. While many may feel that the end of this emergency is in sight, and that normal and wholesome conditions will soon return when every man who desires to work may earn a living wage by honest toil, yet no one can say with absolute certainty when that end will come or when that condition will prevail.

In the meantime many homes burdened with mortgages are threatened with foreclosure and the present economic conditions prevent competitive bidding at foreclosure sales. On the other hand, many aged persons no longer able to perform gainful la-

bor, who have invested their lifetime savings in a mortgage, are unable to collect the interest on their investment. These matters may be said to be more properly considered in determining the policy of the law, a question with which the courts seldom deal. Ordinarily, yes. In this situation, no. For we are asked to sustain this law only on the theory of an emergency, and certainly we are justified in considering every phase of the emergency, both pro and con.

Our strong inclination is to uphold any section of the statute in this present emergency, in order, as far as possible, to protect the equities of home owners and farm owners particularly as against those mortgagees who insist upon a strict observance of the letter of the mortgage contract.

In view of the gravity of the economic situation and its effect in preventing mortgagors meeting the full amount of the mortgage indebtedness on the due date thereof, and its further effect in destroying competitive bidding at foreclosure sales, and in view of the eminence of the authority which has approved such legislation, we have concluded that the situation is such as to warrant a temporary interference with contract rights through the enactment under the police power of appropriate legislation that does not violate constitutional provisions and in which proper provision is made for the protection of the rights of the mortgagee during the period of the delay. Provided, however, that such legislation is not designed to affect cases in which there is no occasion for the exercise of such extraordinary power. These requirements are but a recognition of the basic principle upon which the police power rests. It is said to rest principally upon the legal maxim, "Sic utere tuo ut alienum non laedas" [Cooley's Constitutional Limitations [8th Ed.] p. 1241; 6 R. C. L. 187], which interpreted means. "So use your own that you do not injure that of another."

Assuming, as we do, and must in order to justify the act, that there are a sufficient number of mortgages in which the property owners have been caught in the surge of economic depression in such a manner as to prevent payment of the mortgage on its due date to make the matter involved one of public concern in which the police power of the state may properly be invoked to prevent an unfair and unjust advantage being taken by mortgagees, we still must confine the operation and application of a law enacted for that purpose to the particular class of cases that justify its

existence. As is said by Cooley's Constitutional Limitations (8th Ed.) at page 1231:

"A police measure must fairly tend to accomplish the purpose of its enactment, and must not go beyond the reasonable demands of the occasion."

If in this time of economic depression a mortgagee is seeking an unfair advantage of the mortgagor and forecloses the property because the mortgagor is temporarily unable to meet the obligation, a proper situation for the exercise of the police power may be said to exist, but the exercise of that power must and should be confined strictly to the class of cases that fall within the reason for the enactment of the law. Section 1 of the act in question and each of its three provisions are not so limited in their application, and by their terms they extend to cases in which there may be no necessity at all for an application of the police power of the state.

In all cases equitable requirements should be made for the preservation of the mortgaged premises, the payment of the current interest and taxes, and for appropriate protection of the property by insurance as well as such other requirements as may be proper and just under the circumstances.

The three subdivisions of section 1 each grant an arbitrary and capricious extension of time amounting to a taking of private property without any provision whatever for compensation to or protection of the rights of the mortgagee. In connection with this particular element of the law in question we call attention to the importance that has been attached thereto by the Minnesota court in the recent case of Blaisdell v. Home Building & Loan Ass'n, No. 29165, supra, a case in which moratorium legislation enacted by a state Legislature was upheld. and in connection with which another recent case involving the same subject-matter, State ex rel. Cleveringa v. Klein (N. D.) 49 N. W. 118, opinion filed June 12, 1933, was being considered and compared. We quote portions of the decisions touching upon the compensation feature:

"The rental value of the property must be applied upon the payment of taxes, insurance and the debt. The condition that the mortgagor or the one obtaining the extension to redeem must meanwhile pay the rental value of the property goes far to giving compensation for the extension secured. The relief appears to be no more than what must be regarded as reasonable and just. * * *

"We notice this difference between our

law and that of North Dakota; the act of North Dakota extends the time of redemption unconditionally, while under our act the mortgagor, or the one who desires to avail himself of the extension, must pay the reasonable rental value of the property, during the period of extension, to the party holding the certificate of sale. It appears to us that this provision of our law may be held to provide compensation so that there is no taking of property without due process of law."

Mr. Chief Justice Wilson, specially concurring in the decision of the court in that case, states:

"This statute subjects the mortgagee to the rules of equity, but it also exacts equity, in turn, from the mortgagor as a condition under which he may have a longer time in which to redeem. If the mortgagor gets an extension of time in which to redeem, he is required to substantially protect the mortgagee from loss by reason thereof. * * *

"If it had provided no compensation or protection incident to the extension, I would have agreed to the conclusion reached by the North Dakota court. I would then think the application of the police power was unreasonable."

Likewise, in the famous rent cases decided by the Supreme Court of the United States by a bare majority of five to four we observe that the provision for the continued occupancy by tenants provided for the determination and payment of a fair compensation for the continued use of the property by the occupying renters. Block v. Hirsh, supra; Marcus Brown Holding Co. v. Feldman, supra. Of these same cases Mr. Justice Holmes, the author of the opinions, later said, in the case of Penn Coal Co. v. Mahon, 260 U. S. 293, 67 L. Ed. 322 (in referring to the rent cases), they "went to the very verge of the law." In the opinion in that case the learned justice likewise emphasized the importance of the compensation feature in the rent cases; he said:

"The late decisions upon laws dealing with the congestion of Washington and New York, caused by the war, dealt with laws intended to meet a temporary emergency and providing for compensation determined to be reasonable by an impartial board."

While compensation to private owners of property is not indispensable when the state is exercising its police powers in the ordinary and usual field thereof, it would seem that a different rule should obtain where legislation directly bearing on contractual relations between individuals is enacted in which relief is granted one class of individuals by changing contractual relations with another class. In such cases due process and equal protection of the laws would seem to require compensation and protection.

As is stated by the Supreme Court of the United States in the case of Holden v. Hardy, 169 U. S. 366, 42 L. Ed. 780:

"Recognizing the difficulty in defining, with exactness, the phrase, 'due process of law,' it is certain that these words imply a conformity with natural and inherent principles of justice, and forbid that one man's property, or right to property, shall be taken for the benefit of another, or for the benefit of the state, without compensation; and that no one shall be condemned in his person or property without an opportunity of being heard in his own defense."

And again in the case of Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, Mr. Justice Brewer said:

"The equal protection of the laws, which, by the Fourteenth Amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public."

Likewise the provisions of section 1 have the practical effect of overriding section 6 of article 2 of our state Constitution, which provides:

"The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation, and right and justice shall be administered without sale, denial, delay, or prejudice."

The enlargement of time to answer to nine months is certainly a delay. In fact, it is a denial of judicial action for nine months. Certainly the mortgagee who seeks relief in a court is entitled under the most liberal interpretation of the police power to a judicial determination of whether or not the case presented by him is one of that class of cases to which a moratorium law should apply and to a reasonable protection and compensation during the period of delay. Thus, according to our views, section (1) of the act must fall for the reason that it goes beyond the reasonable necessities of the occasion and applies to cases which do not justify the application of the moratorium law, and for the further reason that it fails to provide for compensation to the mort-

gagee during the period of continuance thereby created.

The present case might be disposed of entirely on the invalidity of section 1 of the act. However, the validity of the remaining provisions of the act must be determined, and an early decision thereon is warranted. We, therefore, pass to a consideration of the remainder of the act.

As we have previously determined, the invalidity of a portion of the act does not necessarily render void the remaining sections thereof.

Sections 2 and 3 of the act, by their provisions, vest in the various district courts of the state the power to grant continuances during a period of two years from the date of the approval of the act under the terms of the condition set out in the act.

Some argument has been advanced that the power thus undertaken to be conferred is an arbitrary one which may be exercised by a judge or court with or without reason and without regard to the merits of the case. This asserted interpretation arises from the use in the act of the phrase, "as he may deem best," when reference is made to the power of the judge to grant a continuance. If this is the only proper interpretation of the provision, they are subject to the same objection which renders section 1 invalid, and we would not hold them unconstitutional. But we do not so interpret these provisions. They may be properly interpreted to vest in the district court the power to exercise judicial discretion in granting continuances on account of existing economic conditions in that class of cases only when (1) the owner shall pay at any time before confirmation of sale the accruing interest and all taxes due upon said property; (2) before confirmation of sale when the owner shall pay or cause to be secured a reasonable rental value for the time or term .which said judge shall order said cause to be continued; (3) where before confirmation it shall appear that the value of the property is sufficient to satisfy the lien and costs of foreclosure, and the owner shall pay or otherwise secure taxes due upon said lands; or (4) when the district court in the exercise of sound judicial discretion shall make such other requirements as will reasonably compensate and adequately protect the mortgagee during the period of delay. Only when so interpreted these provisions may be upheld and applied by the trial courts. In order for the mortgagor in foreclosure proceedings to take advantage of these sections of the act, they must be applied by trial courts strictly. In the exercise of the judicial discretion thus conferred by the act, courts and judges must and do act judicially and must impose such conditions upon the relief granted mortgagors as will prevent the accumulation of tax liens, protect the property, and reasonably compensate the mortgagee during the interval of time during which the period of foreclosure is extended. Continuances shall only be granted by the trial court for such periods of time as in the exercise of judicial discretion shall be necessary to accomplish the purposes of the act. Interpreting the act in question in this manner, sections 2 and 3 may be sustained as a fair and reasonable exercise of the police power of the state.

The adoption of this interpretation of sections 2 and 3 of the act arises out of an application of the rule of statutory construction that when a statute is susceptible of two interpretations, one of which renders the same unconstitutional and invalid, the other rendering it valid, reasonable, and constitutional, the latter will be adopted by the courts.

Having sustained these sections on a particular theory of interpretation, it is essential that the future application of these sections be in accordance with that interpretation.

The power to grant a continuance in a proper case is not a power to be exercised by trial courts or judges as an appeal to cheap popularity, nor to enable them to exercise their judicial authority in accordance with personal whim. The alternative conditions set forth in the statute should be adhered to.

Section 4 of the act relates to the appointment of receivers and may be sustained upon the same reasoning that applies to sections 2 and 3. We do not, however, deem it necessary to consider the validity of that particular provision of section 4 which may be interpreted to prohibit the appointment of a receiver in a case where a homestead is involved which is unoccupied by the owner and in the possession of renters.

It is impossible at this time to anticipate all of the questions that may arise in connection with the application of sections 2, 3, and 4. Situations may, and no doubt will, arise to which these sections cannot be applied for some good legal reason. For instance, it remains to be determined whether or not the act is effective to extend the

period during which the mortgagor may redeem beyond the date of sale. This and other questions of its kind must await decision until an appropriate occasion arises.

It should be mentioned, however, that though the emergency which justifies a portion of the act is more apparent in the case of homesteads than other property, the application of the act is not and need not be strictly confined to homesteads.

In arriving at the conclusion relative to the constitutionality of portions of the act, we feel that we have gone, to borrow the words of Justice Holmes, "to the verge of the law." The provisions of the act which are sustainable are properly so as a fair and reasonable exercise of the police power, not because that power may be exercised to suspend constitutional limitations, but because it, like the law relating to procedure, is a part of the law at the time the contract is executed and the provisions of the contract are therefore subject to its fair and reasonable exercise.

The police power of the state is limited, both by a rule of reason and by constitutional requirement, and while it may be extended to meet temporary emergencies, the extension of the power beyond its historic field must be scrupulously watched and carefully guarded.

An arbitrary interference with private contracts concerning a subject-matter not affecting the public peace, health, or safety cannot be justified. A discretionary power to grant continuances on mortgage foreclosure actions can only be exercised by imposing appropriate conditions for the protection of the rights of the mortgagee and rendering adequate compensation to him, even though the power thus conferred is created to meet an emergency situation. The decision of the trial court is reversed, with directions to proceed in accordance with the views herein announced.

RILEY, C. J., CULLISON, V. C. J., and ANDREWS and BAYLESS, JJ., concur.

SWINDALL, J. I concur in the rule of law announced in paragraphs 1, 2, 3, 6, and 7 of the syllabus, and in that portion of the majority opinion holding sections 2, 3 and 4 of said act constitutional, and the holding that said cause should be reversed, and dissent from the construction placed on sections 2 and 3, and from the other portions of the majority opinion and concur in the views expressed in the dissenting opinion of Mr. Justice OSBORN relative to the construction of the act under consideration.

McNEILL, J., concurs in the views of Justice SWINDALL.

WELCH, J., concurs in the law stated in the syllabus and in the conclusion.

OSBORN, J., dissents.

On Rehearing.

WELCH, J. Since the adoption of the original opinion in this case, prepared by Mr. Justice BUSBY (opinion October 17, 1933, 167 Okla. 209, 29 P. [2d] 24), the Supreme Court of the United States has passed upon the validity of the Minnesota Mortgage Moratorium Law in the case of Home Building & Loan Association v. John H. Blaisdell and Rosella Blaisdell, his wife, 54 S. Ct. 231, 78 L. Ed. ___ opinion January 8, 1934.

Counsel for defendant in error now insists that this decision of the Supreme Court of the United States is authority for sustaining the validity of the Oklahoma Mortgage Moratorium Law in full, and justifies his right to a rehearing in this case.

The Minnesota Supreme Court, 249 N. W. 334, and the United States Supreme Court, upheld the validity of the Minnesota Act. The original opinion of this court, while sustaining the most of the Oklahoma Act, chapter 16, S. L. 1933, in this case, strikes down section 1 thereof, for the reason that said section 1 is unconstitutional.

Due to the importance of the character of legislation involved, and the great weight to which each of the decisions of the highest judicial tribunal of our country is entitled, we deem it beneficial to supplement the former opinion of this court by discussing the opinion of the United States Supreme Court.

The opinion of the Supreme Court of the United States in the Blaisdell Case, supra, does not support the contention of the defendant in error in this case on account of the vital difference between the Minnesota Act and the Oklahoma Act. There are vital differences in the two acts, and vital differences in the court procedure under the Minnesota Act and under section 1 of the Oklahoma Act. These vital differences are directly responsible for the fact that the Minnesota Act does not, and the Oklahoma Act in section 1 does, violate the applicable provisions of constitutional limitation upon the legislative authority.

Both the Minnesota Act and the Okla-

homa Act are temporary in character, and have for their purpose the granting of additional time or delay in the foreclosure of mortgages on account of the existing emergency of economic depression. This purpose is altogether wholesome and wholly legitimate. But, in affording that relief, as in every other enactment, the Legislature must act within its lawful power; and it is in the providing of and for this relief and delay, and in the method and manner of providing for it, that the Oklahoma Legislature overlooks the constitutional limitation on legislative power and violates the Constitution, while the Minnesota Legislature, by fixing reasonable conditions upon the relief and delay obtainable, recognized such limitation and did not violate the Constitution. We should here note in detail some of the differences between the Minnesota Act and the Oklahoma Act. The Oklahoma Act, in section 1, purports to grant a flat or fixed extension of time or delay of nine months to answer in any foreclosure action pending or to be filed. The Minnesota Act grants no flat or fixed time or delay in any instance whatever, but the Minnesota Act authorizes the trial judge, on application of the mortgagor, to grant additional time for redemption and postponement of execution sales, the time to be fixed by the trial court in each case in its judicial discretion, not, however, beyond May 1, 1935, the terminative date of the Act. Section 1 of the Oklahoma Act purports to grant a fixed and flat extension of nine months' time in which no court shall hold or conduct a trial in a foreclosure action now pending wherein the issue is already joined. The Minnesota Act fixes and imposes no delay whatever in judicial action by the court in foreclosure cases. Section 1 of the Oklahoma Act purports to grant fixed and flat delays and extensions of nine months' time without any compensation whatever to the mortgagee; while the Minnesota Act authorizes the trial court to grant extensions and delay only after the trial court has first conducted a hearing and determined the reasonable rental value of the property, and has by order required the mortgagor, during the period of extension or delay granted, to pay all, or a reasonable portion, of such rental value to the mortgagee to apply on the interest on the loan and the taxes on the property. The period of nine months attempted to be granted by section 1 of the Oklahoma Act is a fixed time, and may not be shortened by order of the court; while in proceedings under the Minnesota Act, even though the court has heard the matter and granted an extension of time determined to be reasonable in the instant case, and has fixed the amount of rental value to be paid in the case, the court may at any time thereafter shorten the time granted, where any change in condition justifies it as an equitable action of the court, and requires it in the protection of the interest of any of the parties.

It will thus be noted that the Oklahoma Act proposes to grant extensions and delays in case of every action to foreclose a real estate mortgage without regard to whether in that particular case the delay is necessary or equitably justifiable; while the Minnesota Act does not itself grant any delay whatever and only authorizes the trial court to grant the delay when, upon application of the mortgagor, the court determines, first, whether any delay is necessary, equitable, and proper; second, the amount of delay that in that particular case is justified; third, determines the amount of reasonable rental value which the mortgagor should pay in that particular case upon the particular property involved in that case; and thereupon, fourth, the court grants the delay determined to be reasonable and proper in that case upon the expressed condition of payment of the sum found reasonable and proper to be paid upon the property therein involved, and with the further wholesome provision that under the Minnesota Act the court may thereafter change the period of time granted and grant a longer extension or shorten the extension theretofore granted, if any change in condition warrants such action.

Thus, under section 1 of the Oklahoma Act, the extensions of time are fixed and are granted to the mortgagor in every case, thus being applicable alike to those cases where the extension of time is neither necessary nor equitable, as well as those cases where an extension of time is necessary and equitable by reason of the inability of the mortgagor to pay, and by reason of the desire of the mortgagor to continue to own or occupy the premises, and by reason of his desire to have the extension of time in order that he may arrange to protect himself, and arrange to discharge his debt at a more convenient time when conditions will permit him to be better able to do so, while under the Minnesota Act all matters in reference to the granting of time and the terms thereof are continuously subject to the jurisdiction and judicial action of the trial court, with specific authority in that court to change the extension of time granted, and the terms and conditions thereof.

Having in mind these differences in the two legislative enactments, we observe this in reference to the decision of the Minnesota Supreme Court upholding the Minnesota Act, and the decision of the Supreme Court of the United States in the Blaisdell Case affirming the judgment of the Minnesota Supreme Court.

The Minnesota Supreme Court gave controlling force to the provision of the Minnesota Act which indicated that the Act did not exceed that which was reasonably necessary in any case to give relief to an unfortunate mortgagor, and to the provision of the act for compensation, or payment, during the delay or period of extension, of a sum determined by the court in view of the rental value of the property involved in the action in which the relief was granted. The holding of that court in that regard is concisely stated in syllabus par. No. 3, in that case, Blaisdell v. Home Building & Loan Ass'n, 249 N. W. 334:

"Statute under which time for redeeming from mortgage foreclosure sale may be extended held not to exceed that which was reasonably necessary to give relief in temporary emergency, where statute was not to remain in operation beyond May 1, 1935, and during period of extension, rental value of property must be applied on payment of taxes, insurance, and debt. (Laws 1933, c. 339.)"

And in the body of the opinion the court stressed these portions of their act and specifically noted a similar act in North Dakota, which the North Dakota Supreme Court had held unconstitutional. The Minnesota Supreme Court specifically notes that the act of the North Dakota Legislature extended time of redemption without conditions, while under the Minnesota Act the extension was granted by the court only upon reasonable conditions, that is, the payment of the reasonable rental value of the property during the period of extension. And based upon that provision for compensation, and the provisions for judicial hearings after notice, the Minnesota court held that the Minnesota Act did not take property without due process of law. This conclusion might be said to naturally follow, because in proceedings under the Minnesota Act no extension at all was granted until there had first been had a judicial hearing, and upon notice and a determination of a right or necessity of the mortgagor to have an extension, and the reasonable amount of extension to be granted, and the fixing of reasonable compensation to be paid by the mortgagor during the period of delay or ex-

tension. The Chief Justice of the Minnesota Supreme Court, whose concurrence was essential to the adoption of the opinion, concurred, but in doing so stated:

"If it (referring to the Minnesota Act) had provided no compensation or protection incident to the extension, I would have agreed to the conclusion reached by the North Dakota court. I would then think the application of the police power was unreasonable."

In the Minnesota case the trial court found that the time to redeem would expire under prior law on May 2, 1935; that the mortgagors occupied the premises as their homestead, occupying three rooms and offering the remaining rooms for rent to others; that the reasonable value of the income on the property, and the reasonable rental value, was $40 per month. Thereupon, acting pursuant to the provisions of the Moratorium Act, the court entered its judgment extending the period of redemption to May 1, 1935, the last date to which an extension could be granted under the act, subject to the condition that the mortgagor should pay to the mortgagee $40 per month through the extension period from May 2, 1933, all these amounts to go to the payment of taxes on the property, insurance, interest, and to apply on the mortgage indebtedness.

The Supreme Court of the United States, in the decision first above cited, affirmed the judgment of the Minnesota Supreme Court, and likewise gave controlling effect to the provisions of the Minnesota Act, which we have above noted as being vitally different from the provisions of section 1 of the Oklahoma Act, supra.

The opinion of the Supreme Court of the United States was delivered by Mr. Chief Justice Hughes. On page 232 of the opinion it is said:

"We are here concerned with the provisions of part 1, section 4, authorizing the district court of the county to extend the period of redemption from foreclosing sales 'for such additional time as the court may deem just and equitable,' subject to the above described limitation. The extension is to be made upon application to the court, on notice, for an order determining the reasonable value of the income on the property involved in the sale, or if it has no income, then the reasonable rental value of the property, and directing the mortgagor to 'pay all or a reasonable part of such income or rental value, in or toward the payment of taxes, insurance, interest, mortgage * * * indebtedness at such times and

in such manner' as shall be determined by the court."

Further in the body of the opinion it is said:

"We approach the questions thus presented upon the assumption made below, as required by the law of the state, that the mortgage contained a valid power of sale to be exercised in case of default; that this power was validly exercised; that under the law then applicable the period of redemption from the sale was one year and that it has been extended by the judgment of the court over the opposition of the mortgagee-purchaser; and that during the period thus extended, and unless the order for extension is modified, the mortgagee-purchaser will be unable to obtain possession, or to obtain or convey title in fee, as he would have been able to do had the statute not been enacted. The statute does not impair the integrity of the mortgage indebtedness. The obligation for interest remains. The statute does not affect the validity of the sale or the right of a mortgagee-purchaser to title in fee, or his right to obtain a deficiency judgment, if the mortgagor fails to redeem within the prescribed period. Aside from the extension of time, the other conditions of redemption are unaltered. While the mortgagor remains in possession he must pay the rental value as that value has been determined, upon notice and hearing, by the court. The rental value so paid is devoted to the carrying of the property by the application of the required payments to taxes, insurance, and interest on the mortgage indebtedness. While the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period.

"In determining whether the provision for this temporary and conditional relief exceeds the power of the state by reason of the clause in the federal Constitution prohibiting impairment of the obligations of contracts, we must consider the relation of emergency to constitutional power, the historical setting of the contract clause, the development of the jurisprudence of this court in the construction of that clause, and the principles of construction which we may consider to be established.

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the states were determined in the light of emergency and they are not altered by emergency."

Further in the opinion it is said:

"The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end."

Further in the opinion it is said:

"Whatever doubt there may have been that the protective power of the state, its police power, may be exercised—without violating the true intent of the provision of the federal Constitution—in directly preventing the immediate and literal enforcement of contractual obligations by a temporary and conditional restraint, where vital public interests would otherwise suffer, was removed by our decisions relating to the enforcement of provisions of leases during a period of scarcity of housing. Block v. Hirsh, 256 U. S. 135; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170; Edgar A. Levy Leasing Co. v. Siegel, 258 U. S. 242."

Those three former decisions are then analyzed in the opinion, and in each of these opinions controlling effect was likewise given to the provisions providing for compensation.

After reviewing various authorities in keeping with the contentions of the parties, the Supreme Court of the United States in that case, in the concluding pages of the opinion, applied the criteria established by former decisions, and stated its conclusion in five numbered paragraphs as follows: First, in substance, that an emergency existed in Minnesota by reason of a general depression which furnished a proper occasion for the exercise of the reserve power of the state to protect the vital interests of the community. Second, in substance, that the Minnesota Act was addressed to a legitimate end. Third, quoting in full:

"In view of the nature of the contracts in question—mortgages of unquestionable validity—the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency and could be granted only upon reasonable conditions."

Fourth, quoting:

"The conditions upon which the period of redemption is extended do not appear to be unreasonable. The initial extension of the time of redemption for 30 days from the approval of the act was obviously to give a reasonable opportunity for the authorized application to the court. As already noted, the integrity of the mortgage indebtedness is not impaired; interest continues to run; the validity of the sale and the right of a mortgagee-purchaser to title or to obtain

a deficiency judgment, if the mortgagor fails to redeem within the extended period, are maintained; and the conditions of redemption, if redemption there be, stand as they were under the prior law. The mortgagor during the extended period is not ousted from possession but he must pay the rental value of the premises as ascertained in judicial proceedings and this amount is applied to the carrying of the property and to interest upon the indebtedness. The mortgagee-purchaser during the time that he cannot obtain possession thus is not left without compensation for the withholding of possession. Also important is the fact that mortgagees, as is shown by official reports of which we may take notice, are predominantly corporations, such as insurance companies, banks, and investment and mortgage companies. These, and such individual mortgagees as are small investors, are not seeking homes or the opportunity to engage in farming. Their chief concern is the reasonable protection of their investment security. It does not matter that there are, or may be, individual cases of another aspect. The Legislature was entitled to deal with the general or typical situation. The relief afforded by the statute has regard to the interest of mortgagees as well as to the interest of mortgagors. The legislation seeks to prevent the impending ruin of both by a considerate measure of relief.

"* * * Although the courts would have no authority to alter a statutory period of redemption, the legislation in question permits the courts to extend that period, within limits and upon equitable terms, thus providing a procedure and relief which are cognate to the historic exercise of the equitable jurisdiction.

"If it be determined, as it must be, that the contract clause is not an absolute and utterly unqualified restriction of the state's protective power, this legislation is clearly so reasonable as to be within the legislative competency."

Fifth, quoting:

"The legislation is temporary in operation. It is limited to the exigency which called it forth. While the postponement of the period of redemption from the foreclosure sale is to May 1, 1935, that period may be reduced by the order of the court under the statute, in case of a change in circumstances, and the operation of the statute itself could not validly outlast the emergency or be so extended as virtually to destroy the contracts.

"We are of the opinion that the Minnesota statute as here applied does not violate the contract clause of the federal Constitution. Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned.

"What has been said on that point is also applicable to the contention presented under the due process clause. Block v. Hirsh, supra.

"Nor do we think that the statute denies to the appellant the equal protection of the laws. The classification which the statute makes cannot be said to be an arbitrary one. Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283; Clark v. Titusville, 184 U. S. 329; Quong Wing v. Kirkendall, 223 U. S. 59; Ohio Oil Co. v. Conway, 281 U. S. 146; Sproles v. Binford, 286 U. S. 374."

Thus is made apparent the extent to which the Supreme Court of the United States gave controlling effect to the provisions of the Minnesota Act, providing for a judicial hearing and a day in court before any extension of time was granted, and providing for such extension as was determined to be reasonable in each case, to be granted only after determination and requirement as to payment of the proper and reasonable sum, dependent upon the reasonable rental value of the premises.

Sections 2 and 3 of the Oklahoma Act are quite similar to the Minnesota Act. These sections authorize the trial courts in Oklahoma to grant continuances and extensions of time upon equitable terms within the two-year limit of the act. We here repeat the words of the Supreme Court of the United States in speaking of the Minnesota Act:

"Although the courts would have no authority to alter a statutory period of redemption, the legislation in question permits the courts to extend that period, within limits and upon equitable terms, thus providing a procedure and relief which are cognate to the historic exercise of the equitable jurisdiction."

We are impressed with the force with which this statement, and many other expressions of that court above quoted, would likewise apply to sections 2 and 3 of the Oklahoma Act.

In the majority opinion of this court in the instant case, prepared by Mr. Justice BUSBY, in upholding the provisions of sections 2 and 3 of the Oklahoma Act, this court said:

"They may be properly interpreted to vest in the district court the power to exercise judicial discretion in granting continuances on account of existing economic conditions in that class of cases when (1) the owner shall pay at any time before confirmation of sale, the accruing interest and all taxes due upon said property; (2) before confirmation of sale when the owner

shall pay or cause to be secured a reasonable rental value for the time or term which said judge shall order said cause to be continued.; (3) where, before confirmation, it shall appear that the value of the property is sufficient to satisfy the lien and costs of foreclosure, and the owner shall pay or otherwise secure taxes due upon said land; or (4) when the district court in the exercise of sound judicial discretion shall make such other requirements as will reasonably compensate and adequately protect the mortgagee during the period of delay."

Thus clearly announcing the same reasoning and theory of the Supreme Court of the United States in construing the Minnesota Act. The Minnesota Act, chapter 339, S. L. Minn. 1933, granted no extension of time whatever to answer actions to foreclose mortgages, and granted no delay in the trial of mortgage foreclosure actions after issues were joined, while, as we have heretofore observed, section 1 of the Oklahoma Act granted a fixed extension or delay of nine months to answer in such suits, and a fixed delay of trial of nine months in actions now pending. The Minnesota Act only provided for the judicial granting of an extension of time in the confirmation of mortgage foreclosure sales, or in the time to redeem. The second and third sections of the Oklahoma Act, which were held valid by the majority opinion heretofore referred to in this case, appear to make ample provision for judicial granting of continuances, and for delay in confirmation of foreclosure sales, and in fact in some respects go further than the Minnesota Act. If the valid portion of the Oklahoma Act is applied in keeping with the construction placed upon it in the majority opinion, the trial judge, in so applying it in Oklahoma, may grant to mortgagors, in such cases as they are entitled to relief, virtually all of the relief, which may be granted in Minnesota under the provisions of the act sustained by the Supreme Court of the United States, and in some instances delay may be granted here which is not authorized in that state. This is apparent from a reading of the act as quoted in the majority opinion and the construction therein placed upon it. Only a casual reading thereof is necessary to observe the provisions under which the trial court may grant extensions and delay which will, to a large extent at least, meet the needs and necessities of mortgagors who, by reason of the facts in each case, are entitled to receive it, as well as may possibly be done, and upon such terms and conditions of securing or paying a reasonable rental value, or payment of interest and taxes, as would be sustainable under the decision of the Supreme Court of the United States.

The Supreme Court of the United States said:

"In view of the nature of the contracts in question—mortgages of unquestionable validity—the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency and could be granted only upon reasonable conditions."

Announcing the same principle, this court said, in the case at bar (syllabus par. 4):

"Situations may arise which justify an extension of the police powers of the state to remedy economic conditions, but when such power is undertaken to be exercised with that object in view to the detriment of one class of persons, appropriate provisions for protecting the rights of that class of persons and providing compensation for rights infringed upon, should be provided."

And again, in the body of the opinion, we say:

"In view of the gravity of the economic situation and its effect in preventing mortgagors meeting the full amount of the mortgage indebtedness on the due date thereof, and its further effect in destroying competitive bidding at foreclosure sales, and in view of the eminence of the authority which has approved such legislation, we have concluded that the situation is such as to warrant a temporary interference with contract rights through the enactment under the police power of appropriate legislation that does not violate constitutional provisions and in which proper provision is made for the protection of the rights of the mortgagee during the period of the delay."

And also:

"In all cases equitable requirements should be made for the preservation of the mortgaged premises, the payment of the current interest and taxes and for appropriate protection of the property by insurance as well as such other requirements as may be proper and just under the circumstances.

"The three subdivisions of section 1 each grant an arbitrary and capricious extension of time amounting to a taking of private property without any provision whatever for compensation to or protection of the rights of the mortgagee."

It is clearly apparent that the recent opinion of the Supreme Court of the United States is added authority for the views previously announced by this court in the case at bar, in upholding in part and striking down in part the Oklahoma Mortgage Moratorium Act.

For the reasons stated in the majority opinion, and the additional reasons herein stated, we adhere to the majority opinion which invalidates section 1 of chapter 16, S. L. 1933, but sustains the validity of other portions of that act as being within the reserved power of the state, and a reasonable exercise of that power devoted to a legitimate end in view of existing emergency need.

The petition for rehearing is denied.

RILEY, C. J., CULLISON, V. C. J., and ANDREWS, BAYLESS, and BUSBY, JJ., concur. SWINDALL, McNEILL, and OSBORN, JJ., dissent.

SWINDALL, J. (dissenting). I cannot agree with the views expressed in the supplemental opinion on rehearing delivered by Mr. Justice WELCH and concurred in by a majority of the members of this court, for the reason that I fail to see any material difference between the act under consideration by this court and the act of the Minnesota Legislature approved by the Supreme Court of that state and affirmed on appeal by the Supreme Court of the United States. All the members of the Supreme Court of Oklahoma agree that the third paragraph of section 1, chapter 16, Session Laws 1933, is unconstitutional. The first and second are stricken down in the majority opinion. The remainder of the act is held to be a reasonable police regulation. I cannot agree that paragraphs 1 and 2 of section 1 are arbitrary. The only issue for us to determine is whether the legislation is addressed to a proper legislative end and the measures taken are reasonable and appropriate to that end. Section 4 authorizes the court or judge of the district or superior courts to appoint receivers of property under foreclosure, except when the same may be a homestead, to preserve, rent, and operate said property, or to prevent waste where the occupant thereof is willfully injuring or destroying the improvements on any property sought to be foreclosed, and apply the receipts as the court may direct during the time for which said cause is continued. As stated in the dissenting opinion of Mr. Justice OSBORN, the grounds for appointing receivers under said act are supplementary, and in addition to the grounds for appointing a receiver under section 773, O. S. 1931. So, it appears to me that where the district and superior courts are granted authority to appoint receivers to take charge of the property and apply the rents and profits in such manner as the court may direct, it gives to all parties as much pro-

tection as does the Minnesota Act, and that the Legislature has the right to enlarge the time in which a defendant may answer, provided such enlargement does not deny a remedy or so embarrass it with conditions or restrictions as seriously to impair the value of the right, and construing said act in its entirety and eliminating the third paragraph of section 1, which the entire court agrees should be eliminated, then the act constitutes a reasonable police regulation, and we should so hold.

For these reasons, I most respectfully dissent from the views expressed by Mr. Justice WELCH and concurred in by a majority of my associates.

OSBORN, J. (dissenting). In dissenting from the majority opinion on rehearing in the above cause, I call attention to my dissenting opinion filed October 17, 1933, in the companion case of State ex rel. Osage County Savings & Loan Ass'n v. Worten, District Judge, 167 Okla. 187, 29 P. (2d) 1, decided at the same time as the original decision in the above case, which dissenting opinion expresses my views on this important subject.

After carefully reading the opinion of the Supreme Court of the United States delivered by Chief Justice Hughes in the case of Home Building & Loan Association v. Blaisdell et al., 54 S. Ct. 231, 78 L. Ed.— (Minn.) 249 N. W. 334, I remain of the opinion that when the entire act under consideration by this court is construed as set forth in my prior dissenting opinion, said act was violative of no provision of the state or federal Constitutions.

McNEILL, J. (dissenting). I dissent. This is an appeal from the district court of Tulsa county involving the Mortgage Moratorium Law, which became effective on March 7, 1933, being Senate Bill No. 76, of the Fourteenth Legislature, chapter 16, Session Laws 1933. Plaintiff filed a mandamus action subsequent to the effective date of said legislative enactment, to compel the court clerk to sign and issue a summons in the foreclosure of a mortgage so as to have said summons show that the answer must be filed within 20 days after the date in which the summons was returnable as provided by section 284, C. O. S. 1921, instead of nine months after the date of service of summons on the defendant as provided by said Moratorium Law.

This court reverses the action of the trial court, and it is my opinion that a rehearing

should be granted in this case and that the judgment of the trial court should be affirmed.

The majority opinion holds that section 1 of the Moratorium Law is unconstitutional for the reason that it arbitrarily delays mortgage foreclosure actions without adequate provision for compensation to the mortgagee; that said section goes beyond the reasonable demands of the occasion; and that it violates section 6, article 2 of the Constitution of Oklahoma, to wit:

"The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay or prejudice."

Section 1 of said act relates to all actions for the foreclosure of mortgages or other liens upon real estate. Paragraph 1, in substance, provides that in all actions now pending, wherein the answer of the defendant has not been filed, such defendant shall not be required to answer in said case until nine months after the date of the service of summons upon such defendant; paragraph 2, that the defendant shall not be held to answer in any action hereinafter filed for the foreclosure of a mortgage until nine months after the date of service upon such defendant; paragraph 3, that no court of this state shall render judgment in any action pending in the courts of this state for the foreclosure of a mortgage in which the answer of the defendant has been filed, and no trial shall be had and no judgment rendered in such action until the expiration of nine months after the passage and approval of this act.

The majority opinion also concludes that case No. 24681. State ex rel. Osage Savings & Loan Association v. Jesse J. Worten, District Judge, 167 Okla. 187, 29 P. (2d) 1, delivered at the same time as the instant opinion, disposes of and totally annuls paragraphs 1 and 3, supra, because said paragraphs relate to actions pending at the time the act became effective on the theory that the Moratorium Act undertook to change the procedure in actions pending at the time of its enactment in direct conflict with section 54 of article 5 of the state Constitution. The majority opinion then concludes that the discussion in the instant case is to narrow the constitutionality of the act, as applied to actions commenced subsequent to the effective date of the act.

The majority opinion strikes down the legislative enactment as to actions pending at the time of the enactment upon the theory of a change of procedure, and then, in effect, ignores such holding by concluding that each of the three paragraphs of section 1 is unconstitutional. Such theories offend each other.

It is my opinion that confusion has entered into an analysis of the Moratorium Act. The real and apparent difficulty, as it appears to me, seems to be the failure on the part of the court to arrive at a proper application and limitation of the police powers of this state. A gloam of uncertainty seems to prevail as to whether the police power is supreme, equal to, or inferior to the constitutional provisions of this state; whether this source of power was inherently within the Constitution, or whether it was separate and apart from the Constitution. In fact, this phase of academic discussion was immaterial in considering the constitutionality of the Moratorium Law. It was unnecessary to trace and determine the source from which the Legislature may have derived its power to pass this specific enactment under the guise of its police powers. It was sufficient if the act was designed to accomplish a purpose within the proper exercise of the police power of the state. 6 R. C. L. 197; Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923. The Legislature is the sole judge as to when and how the police power of the state is to be exercised, 6 R. C. L. 240. However, the power is always subject to the supervision of the courts. 6 R. C. L. 241; People v. Elerding, 254 Ill. 597, 98 N. E. 982, 40 L. R. A. (N. S.) 893.

The majority opinion, after a discussion of the economic depression, says:

"Section 1 of the act in question and each of its three provisions are not so limited in their application, and by their terms they extend to cases in which there may be no necessity at all for an application of the police power of the state."

It was the view of the Legislature that there was occasion and necessity existing for the instant law by reason of the economic depression. It was the duty and function of the Legislature to discern and correct evils involving the general tranquility, repose, and well-being of the citizens of the state, and to protect their property rights and their general prosperity. It is not within the competency of this court to weigh the strength of the different views as to whether there were sufficient facts to justify the enactment of such law in the exercise of reasonable and legitimate police power, but this question of public policy was ex-

clusively within the province of the Legislature. We must assume as a court that such a state of facts did exist. In fact, this court takes judicial knowledge that an economic depression of such magnitude, state, national and world-wide, has not existed since the foundation of this government. The Legislature was empowered with authority to enact a remedial law as applied to foreclosures affecting real estate in the exercise of its reasonable and legitimate police power, provided such an enactment did not offend some provisions of the state and federal Constitutions. The judiciary in the performance of its constitutional functions affords complete protection and an efficacious curb to the police power.

In the case of Mid-West Petroleum Corp. v. State Board of Tax Commissioners, 187 N. E. 882, the Supreme Court of Indiana said:

"The authority of the Legislature to determine what things are injurious to the interest and welfare of the public and what measures are necessary for the safety, comfort and well-being of the citizens of the state, is extensive and far-reaching, and, as has often been said, is incapable of strict definition or limitation. A legislative declaration that an evil exists or that injury is likely to result to the public from particular trades or occupations unless restrained or regulated by law, is entitled to the highest respect by the courts, and should never be disregarded unless clearly in conflict with some provision of the Constitution."

The majority opinion expressly holds that each of said paragraphs of said section 1 grants an arbitrary and capricious extension of time amounting to a taking of private property without any provision whatever for compensation to or protection of the rights of the mortgagee, which is nothing more than impairment of contract obligations. In my opinion, the remedial rights of the mortgagee have not been impaired, but, on the other hand, have been fully and carefully taken care of and a benefit has been bestowed upon both of the litigants mortgagor and mortgagee, by the provisions of the act. There was a general domestic commotion prevailing throughout the state at the time the act was passed by the Legislature. In view of the universal economic depression which was on every hand, there was no actual sale of property through competitive bidding under an execution.

The majority opinion also states: "That the real difficulty in this case is the extremely questionable right to extend the police power to the class of contract under consideration." This contention falls far short of the basic reasoning for the Moratorium Law. The opinion concludes that sections 2 and 3 of the act may be sustained as a fair and reasonable exercise of police power of the state, and that an arbitrary interference with private contracts concerning a subject-matter not affecting the public peace, health or safety cannot be justified.

To say that mortgage contracts at this hour do not affect the public peace or safety is to completely ignore the general depressed conditions which are being witnessed on every hand. A statement in the petition for rehearing, to the effect that between October 17th and November 1st, a period of 14 days, 57 foreclosure actions were filed in Oklahoma City alone, stands unchallenged. We have the right to assume that like deplorable conditions exist in other portions of the state.

The Fourteenth Amendment to the Constitution of the United States does not restrain the states in the exercise of their legitimate police power. Pacific Gas & E. Co. v. Police Court, 64 L. Ed. 112, 251 U. S. 22. In short, the real question is whether or not the Moratorium Act is within the legitimate exercise of the police power of this state. Under all the authorities which I have reviewed, and those are many, I conclude that the moratorium enactment was embraced within the police power of the state, and interdicts no provisions of the state or federal Constitutions; that it was a reasonable and legitimate exercise of police power and was not destructive of any rights secured by the state or federal Constitutions, and that its provisions were not so unreasonable and oppressive as to amount to a deprivation of property without due process of law or impairing any obligation of a contractual nature, including the remedy provided by law.

I first consider authorities dealing in general with the police powers of the state.

6 R. C. L. section 182, p. 183:

"The police power is an attribute of sovereignty, possessed by every sovereign state. * * *It is inherent in the states of the American Union and is not a grant derived from or under any written Constitution." Citing State v. Gerhardt, 145 Ind. 439, 44 N. E. 469, 33 L. R. A. 313; Wenham v. State. 65 Neb. 394, 91 N. W. 421, 58 L. R. A. 825; State v. Superior Court for King County, 67 Wash. 37, 120 P. 861, Ann. Cas. 1913d, 78.

6 R. C. L. p. 191:

"The only limit to its exercise in the enactment of laws is that they shall not prove repugnant to the provisions of the state or national Constitution." Citing State v. Moore, 104 N. C. 714, 10 S. E. 143. 17 A. S. R. 696.

6 R. C. L. section 193, p. 195:

"While there are no precise limits to the police power." Citing Hawker v. New York, 170 U. S. 189, 18 S. Ct. 573, 42 L. Ed. 1002. "It is not, however, without its limitations, since it may not unreasonably invade private rights." Lochner v. New York, 198 U. S. 45, 25 S. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; Haller Sign Works v. Physical Culture Training School, 249 Ill. 436, 94 N. E. 920, 34 L. R. A. (N. S.) 998; Ex parte Boyce, 27 Nev. 299, 75 P. 1, 1 Ann. Cas. 66, 65 L. R. A. 47; State v. Smith, 42 Wash. 237, 84 P. 851, 114 A. S. R. 114, 7 Ann. Cas. 577, 5 L. R. A. (N. S.) 674.

Mott on Due Process of Law, page 300, states:

"The power of police is probably as old as government itself, but as a separate classification of a distinct group of the powers of the state, it probably originated in the Seventeenth Century with the concept of sovereignty, to which it is so clearly related. Blackstone spoke of 'public police economy' as one of the attributes of sovereignty, and under this heading discussed many regulations now well recognized as exertions of the police power. The idea has a firm basis in the English common law, being closely associated with such ancient maxims as 'Sic utere tuo ut alienum non laedas,' and 'Salus populi suprema lex,' from which it derived its original legal authority. The concept was not unknown in the American colonies, and there were references to it in the Constitutional Convention of 1787, in the Federalist, and in many of the earlier American law treatises. Many of these may be traced to Montesquieu's Spirit of the Laws. It is also very closely related to the 'domestic tranquility' of the Preamble to the Constitution.

"Like many other important phrases of American constitutional law, the term 'police power' was first used by Chief Justice Marshall. In a number of important decisions during the first quarter of the Nineteenth Century he spoke of the 'power of a state to regulate its police,' but the first time in which the single phrase 'police power' was used seems to have been in his opinion in Brown v. Maryland [12 Wheat. 419, 6 L. Ed. 678] (1827). In this case he only employed it in an offhand way, and it did not come into general legal use until nearly a quarter of a century later. At that time it became politically important in the efforts of the states to resist the encroachments of federal power under the commerce clause. It was not, indeed, until after the full discussion of this power in the License Cases, that the term was taken up by the state courts. The term was not listed in the Standard American Law Dictionary (Bouvier's) until 1883, although this work had gone through thirteen earlier editions."

Mr. Chief Justice Taney, speaking for the Supreme Court of the United States in License Cases (U. S. 1847), 5 How. 504, at 583, 12 L. Ed. 291, said:

"What are the police powers of a state? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. That is to say * * * the power to govern men and things within the limits of its dominion."

In 1851, Mr. Chief Justice Shaw, in Commonwealth v. Alger, 7 Cush. (Mass.) 53, on page 85, defined the police powers as follows:

"The power vested in the Legislature by the Constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same."

Mr. Justice Marshall in the case of State of Wisconsin v. John Redmon, 114 N. W. 137, 14 L. R. A. (N. S.) 229, in discussing the police power, said:

"It were better to always say that the police power extends to and permits legislation regulating, reasonably, matters appertaining to the public welfare, since anything beyond that must necessarily fall at the threshold of some constitutional defense. It is a great power having more to do with the well-being of society than any other, yet one which, if exercised autocratically, would supersede some of the most cherished principles of constitutional freedom. It may be extended disastrously, or restrained and administered beneficially, according as the judiciary shall perform its constitutional functions. Confined within its legitimate field of reasonable regulation, it is essential, as we have heretofore indicated, to the full accomplishment of the purposes of civil government. * * *

"The inquiries to be solved in testing an enactment purporting to be for the promotion of the public health, as to whether it is fairly within the field of police power, are well stated at sec. 143, Freund, Police Power, thus: 'Does a danger exist? Is it of sufficient magnitude? Does it concern the public? Does the proposed measure tend to remove it? Is the restraint or requirement in proportion to the danger? Is it possible to secure the object sought without impairing essential rights and prin-

ciples?' The judgment of the Legislature, of course, as to all of them, is to be taken as correct, unless it appear to be clearly wrong; and also it is to be taken as true that its ostensible is its actual purpose, unless the contrary clearly appears."

In the recent case of Walker v. Bedford, State Treasurer, 26 P. (2d) 1051, Mr. Justice Butler, in considering the police power involving the act of the Legislature of Colorado providing for additional emergency relief funds by the imposition of additional fees upon the registration of motor vehicles, etc., and the disposition of the proceeds thereof, in a dissenting opinion, said:

"* * * The police power, which, according to the highest court in the land, 'is inherent in every sovereignty' (Lake Shore & M. S. Ry. Co. v. Smith, 173 U. S. 684, 19 S. Ct. 565, 567, 43 L. Ed. 858), and 'is the least limitable of the exercises of government' (Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 220, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Sligh v. Kirkwood, 237 U. S. 52, 35 S. Ct. 501, 59 L. Ed. 835). Indeed, that great court has said that 'it is elementary that the due process clause of the Fourteenth Amendment does not restrain the states in the exercise of their legitimate police power.' Pacific Gas & E. Co. v. Police Court, 251 U. S. 22, 40 S. Ct. 79, 81, 64 L. Ed. 112. And, see Barbier v Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923. and Jones v. City of Portland, 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660."

In the case of Jones v. Portland, supra, Mr. Justice Day, of the Supreme Court of the United States, said:

"* * * It is not the function of this court, under the authority of the 14th Amendment, to supervise the legislation of the states in the exercise of the police power beyond protecting against exertions of such authority in the enactment and enforcement of laws of an arbitrary character, having no reasonable relation to the execution of lawful purposes. * * *"

In the case of Sligh v. Kirkwood, supra, Mr. Justice Day said:

"The limitations upon the police power are hard to define, and its far-reaching scope has been recognized in many decisions of this court. At an early day it was held to embrace every law or statute which concerns the whole or any part of the people, whether it related to their rights or duties, whether it respected them as men or citizens of the state, whether in their public or private relations, whether it related to the rights of persons or property of the public or any individual within the state. New York v. Miln, 11 Pet. 102, 139, 9 L. Ed.

648, 662. The police power, in its broadest sense, includes all legislation and almost every function of civil government. Barbier v. Connolly, 113 U. S. 27, 28 L. Ed. 923, 5 Sup. Ct. Rep. 357. It is not subject to definite limitations, but is coextensive with the necessities of the case and the safeguards of public interest. Camfield v. United States, 167 U. S. 518, 524, 42 L. Ed. 260, 262, 17 Sup. Ct. Rep. 864. It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health. Chicago, B. & Q. R. Co. v. Illinois, 200 U. S. 561, 592, 50 L. Ed. 596, 609, 26 Sup. Ct. Rep. 341, 4 Ann. Cas. 1175. In one of the latest utterances of this court upon the subject, it was said: 'Whether it is a valid exercise of the police power is the question in the case, and that power we have defined, as far as it is capable of being defined by general words, a number of times. It is not susceptible of circumstantial precision. It extends, we have said, not only to regulations which promote the public health, morals, and safety, but to those which promote the public convenience or the general prosperity. * * * And further, "It is the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government".' Eubanks v. Richmond, 226 U. S. 137, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, 33 Sup. Ct. Rep. 76, Ann. Cas. 1914 B, 192."

In the case of Dobbins v. Los Angeles, 195 U. S. 223, 49 L. Ed. 169, Mr. Justice Day, in speaking for the Supreme Court of the United States, said:

"The question of constitutional law to which we have referred (the equal protection of the laws) cannot be disposed of by saying that the statute in question may be referred to what are called the police powers of the state, which, as often stated by this court, were not included in the grants of power to the general government, and therefore were reserved to the states when the Constitution was ordained. But, as the Constitution of the United States is the supreme law of the land, anything in the Constitution or statutes of the states to the contrary notwithstanding, a statute of a state, even when avowedly enacted in the exercise of its police powers, must yield to that law. No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived."

In the case of Manigault v. Springs (1905) 199 U. S. 473, 50 L. Ed. 274:

"While this power is subject to limitations in certain cases, there is wide discretion on the part of the Legislature in determining

230

what is and what is not necessary,—a discretion which courts ordinarily will not interfere with. The leading case upon this point is that of Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, in which a franchise to maintain a ferry between Cambridge and Boston, under which a bridge was subsequently erected, was held to be subject to the power of the Legislature to establish a parallel bridge between the same points."

In the case of C. B. & Q. R. Co. v. McGuire, 219 U. S. 549, 55 L. Ed. 328, Mr. Justice Hughes, now Chief Justice of the United States, in considering the constitutionality of a law defining liability of railroad corporations, the freedom of contract, as being infringed by such legislative enactment, and the police power of the state, after quoting from the case of Allgeyer v. Louisiana, 165 U. S. 578, 41 L. Ed. 832, wherein it was said that the freedom of contract was a qualified and not an absolute right, said:

"The right to make contracts is subject * * * in the field of state action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals, and welfare of those subject to its jurisdiction."

After a discussion of the limitation of contracts under a variety of circumstances, Mr. Justice Hughes said:

"The Legislature, provided it acts within its constitutional authority, is the arbiter of the public policy of the state. While the court, unaided by legislative declaration, and applying the principles of the common law, may uphold or condemn contracts in the light of what is conceived to be public policy, its determination as a rule for future action must yield to the legislative will when expressed in accordance with the organic law. * * *

"The principle involved in these decisions is that where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the legislature transcends the limits of its power in interfering with liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. The scope of judicial inquiry in deciding the question of power is not to be confused with the scope of legislative considerations in dealing with the matter of policy. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the Legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

See, also, Mid-Western Petroleum Corp. v. State Board of Tax Commissioners, supra.

I next consider the impairment of any rights of the mortgagee by reason of permitting the mortgagor to file an answer within the period of nine months from the date of the service of summons upon him as provided by the Moratorium Law. Under the early practice of the common law, it was the office of the judges to direct and control the oral contentions made by the litigants. The disputants were obliged to come finally to some specific fact, affirmed by one and denied by the other, or required to submit their disputes upon a disputed point of law. The parties were then said to be ad exitum, at the end of their pleadings. There is no apparent reason why the Legislature in its discretion could not abolish all rules and regulations heretofore prescribed by the Legislature for the conduct of procedure in civil actions, provided the same did not contravene any provisions of the state or federal Constitution and require the courts to pursue the common-law procedure. It hardly seems arguable that if the Legislature should change an answer day from 20 days from the return date of service of summons to 30 or 60 days, that the plaintiff could even be heard to suggest to a court that his rights, if any, had been impaired. This change from 20 days to nine months is nothing but a change in one of the successive steps provided by law to enforce the remedy. It simply acts upon the remedy provided by law. Plaintiff had no vested right in any particular remedy (Berry v. Clary, 77 Me. 482), so long as his right of action is not abolished, and substantive right remains. Hewitt Logging Co. v. Northern Pacific Ry. Co. (Wash.) 166 P. 1153. Plaintiff does not even have an unrestricted right to institute an action in a particular forum. The remedy of the mortgagee to enforce the lien of his mortgage by foreclosure proceedings through a judicial sale is a remedy provided by law. Pomeroy, Equitable Jurisprudence (3d Ed.) sec. 1228. A remedy is the judicial means for enforcing a right or redressible wrong; and this procedure for such enforcement includes pleadings, evidence, and practice. People ex rel. Foote et al. v. Clark, 283 Ill. 221, 119 N. E. 329.

Mr. Chief Justice Taney in Bronson v. Kinzie, 1 How. (January term, 1843) 311, speaking of changing the remedy upon contracts, said:

"For, undoubtedly, a state may regulate at pleasure the modes of proceeding in its courts in relation to past contracts as well as future. It may, for example, shorten the period of time within which claims shall be barred by the statute of limitations. It may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of the mechanic, or articles of necessity in household furniture, shall, like wearing apparel, not be liable to execution on judgments. Regulations of this description have always been considered, in every civilized community, as properly belonging to the remedy, to be exercised or not by every sovereignty, according to its own views of policy and humanity. It must reside in every state to enable it to secure its citizens from unjust and harassing litigation, and to protect them in those pursuits which are necessary to the existence and well-being of every community. And, although a new remedy may be deemed less convenient than the old one, and may in some degree render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional. Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the Constitution."

In this same case, Mr. Justice McLean, in his dissenting opinion to the views expressed by the majority opinion of the Supreme Court of the United States, said:

"Every contract is entered into with a supposed knowledge by the parties, that the law-making power may modify the remedy. And this it may do, at its discretion, so far as it acts only on the remedy. It may regulate the mode in which process shall be issued and served; how the pleadings shall be filed, and at what term judgment shall or may be entered. And it may also regulate final process. It may require that the personal property of the defendant shall be levied on and sold, before land shall be taken in execution. It may say what notice shall be given on the sale of real estate on execution; and also require that it shall sell for one-half or two-thirds of its value. A valuation law in those states where it has been adopted has been found salutary in guarding the rights of debtor and creditor. A debtor, under this law, cannot defeat the claim of his creditor, by purchasing the real estate levied on, through the agency of a friend, at a nominal price; and this protects the rights of the creditors of the defendant generally. There may be some cases of hardship to creditors under such a law, but they must be few and unimportant in comparison with the benefits secured by

the law both to creditors and debtors. Some restriction on the sale of land on execution is required by a sound policy, especially in new and rising states, where real property can scarcely be said to have a final value."

Mr. Justice McLean, in that case, discussed the case of Satterlee v. Matthewson, 2 Peters, 407, wherein the plaintiff at the time of the trial had set up a title under a warrant dated January 10, 1812, founded upon an improvement in the year 1785, which it was admitted was under a Connecticut title, and a patent dated February 19, 1813. The defendant claimed title by reason of the patent issued in 1781, and a conveyance to one Satterlee in 1812. In that case the Supreme Court of Pennsylvania held that: "The relation of landlord and tenant could not subsist under a Connecticut title. * * *" That judgment was reversed, and thereafter, in 1826, the Legislature of that state passed a law declaring, "that the relation of landlord and tenant shall exist, and be held as fully and effectually between Connecticut settlers and Pennsylvania claimants, as between other citizens of this commonwealth, on the trial of any cause now pending or hereafter to be brought within this commonwealth, any law or usage to the contrary notwithstanding." On discussing this question of the impairment of the obligation of the contract and the vested right of the holder of a contract to a particular remedy for its enforcement, Mr. Justice McLean in forcible logic said:

"And again, 'The objection is urged that the effect of this act was to divest rights which were vested by law in Satterlee. There is certainly no part of the Constitution of the United States which applies to a state law of this description; nor are we aware of any decision of this, or of any circuit court, which condemned such a law upon this ground.' Here was a direct legislation not only on existing rights growing out of contracts, but such an effect was given to the law as to divest vested rights. And yet this act was held not to be in violation of the Constitution of the United States.

"What vested right is there or can there be, in the nature of things, in the holder of a contract to the particular remedy for its enforcement which existed at its date? But if there were such a vested right as to the remedy, which there is not, it may under the above authority, be divested by law. * * *

"A state Legislature cannot impair the contract by changing the time or manner of its performance. By the contract, the parties have fixed their rights and obligations; and these are guarded by the Con-

stitution. But the remedy for the enforcement of the contract being established by the law-making power, may be modified at its discretion. This is admitted as regards subsequent contracts, but the same rule applies to prior ones. So far as the mere remedy is concerned, in my judgment, no sound and practical distinction can be drawn between prior and future contracts."

The case of Johnson v. Duncan (La.) 3 Martin, 530, 6 Am. Dec. 675, is one of the outstanding cases on constitutional law. The annotator has this worthy note:

"In the history of our jurisprudence, there cannot be found a more able and lucid exposition of constitutional law than is contained in this case. It admirably expounds and elucidates the distinction between moral and legal obligations, and shows how far legal remedies may be considered as legal rights necessarily incident to contracts. This case, in connection with Jones v. Crittenden, ante, 531, will be therefore instructive."

In that case the Supreme Court of Louisiana considered an act of the Legislature, approved on December 18, 1814, which suspended all proceedings in civil cases until the 1st of May next. It was contended that this section of the legislative enactment was unconstitutional and void inasmuch as it violated the Constitution of the United States which provides that no state shall pass any law impairing the obligation of contracts, and that this law delayed for upwards of four months the recovery of sums due on contracts. The court held in reference to the constitutionality of the suspension law as follows:

"Where there is some public necessity, as in case of war, or invasion, an act suspending legal proceedings, for a limited period, is not unconstitutional; for a statute of this kind rather conduces to the due administration of justice, and is beneficial to parties litigant."

Mr. Justice Martin, in that case, said:

"In making a contract each party must know that his legal remedy must depend on the laws of the country in which he may institute his suit; that the lex loci as to his remedy, even in the states that compose the federal union, is susceptible of judicial improvement; that the number of courts of original and appellate jurisdiction, the nature and extent of the respective jurisdiction of these, the number, time and duration of their sessions, must from time to time, especially in new and growing settlements, be regulated by the Legislature, according to the wants and exigencies of the country.

"If, for example, the sessions of the district courts, which in Louisiana are now held in each parish three times a year, were found too frequent, too inconvenient to jurors, witnesses and suitors, and too expensive to the state, no one can say that the Legislature could not enact that the sessions of these tribunals should be semi-annual only. * * *

"I presume that in any time obnoxious to the due administration of justice, it is the duty and within the power of the Legislature to pass laws to avert or diminish the consequences of the general calamity; and a law called for by such circumstances, and fairly intended to meet the exigency of the day, could not be properly classed among those which impair the obligations of contracts, though one of its consequences would be some delay in the recovery of debts. * * *

"It does not appear to me that the suspension was for a longer time than the courts themselves would have taken, if they had been left to the exercise of their own discretion, unaided by a legislative provision. I am not, therefore, prepared to say that the interference of the Legislature was anything else than the exercise of legitimate authority. The suspension of civil proceedings, under some authority or other, for a short time, was a measure imperiously called for; it has been beneficial to plaintiffs as well as to defendants, in several cases; and although it may create a little delay in the collection of debts, I do not find myself led by duty or inclination to consider the act as impairing the obligations of contracts, and I think it the duty of the court to comply with the object by enforcing the law. * * *

"But the manner in which the authority of enforcing the execution of contracts shall be exercised, and the proper time for exercising it, must be at the discretion of the Legislature, to undergo modifications according to circumstances."

Estes, Pleading (3d Ed.) page 1:

"Remedies for wrongs are secured by proper application by the party or parties entitled thereto, in an action or proceeding against the proper parties in the form prescribed by law."

In the case of The People ex rel. v. Tibbetts, 4 Cowan's Reports, page 384, the Supreme Court of the state of New York considered a statute altering the mode of proceeding in point of form, in a suit pending when the act was passed in reference to whether it interfered with vested rights when it altered the form of remedy merely. In that case the proceeding was commenced before the statute passed. The act sought to hasten the proceedings so as to make the remedy as speedy as possible. The act declared it was lawful for the Supreme Court—

"'To make order for prescribing and limit-

ing the time for the parties to plead and proceed therein, for giving preference to the issues, and for expediting the ulterior proceedings, so as to cause the same to be proceeded upon, and the final determination thereof to be had with the best and most convenient speed that may be and to cause the same to be expedited by all such ways and means as a due regard to the ends of justice will admit, and the case may require."

In speaking of vested rights, the court said:

"If it were true that the statute interfered with vested rights, the court would feel bound to give it the very strictest construction; but there is no such thing. What right is taken away? Are the defendants divested of their defense upon the merits? Their saying that the proceeding is hastened in point of form makes nothing for them. They have no right to complain of this. It is complaining that he is put upon his defense today, whereas he had a right to delay till tomorrow; a singular head of vested right; a right to delay justice. Are not the Legislature competent to take away, or abridge such an evil? It is most important that they should possess this power. The pretence of the defendants does not merit the name of right. It relates to the remedy. The act merely says that, under its regulations, the questions between the parties may, peradventure, be brought to trial six months earlier than they otherwise would have been. This is a very usual subject of legislative interference. Indeed, as was said at the bar, the court might do the same thing independent of the Legislature. Suppose they were to make an order that all rules to plead should be 10 days instead of 20, would it lie with the parties interested to gainsay this? The Legislature are in the habit of changing the form of proceeding, to try rights, in various ways. Take a single instance. Ejectment may now be brought for the people instead of the former more dilatory form of a writ of escheat or intrusion. The former is much the more summary remedy, and was itself instituted by the courts, and applied to various cases where a more dilatory form prevailed according to the ancient practice. This remedy was given to the people by an act of the Legislature (1 R. L. 485, s. 5), which act, too, sanctioned ejectments pending at the time of its passage. Would it be competent for defendants in possession, or against whom ejectments were brought, when that act passed, to object that the remedy against them was thus made too speedy, and demand to be proceeded against by the old writ? To complain that the alteration hurrying them on to trial was a violation of the Constitution, or of vested rights? At this rate, every statute by which the collection of debts or the trial of rights is rendered more speedy, or effectual,

would be inapplicable and void in reference to subsisting rights. We are clear that short rules for pleading should be granted."

In the case of Von Baumbach v. Bade, 9 Wis. 559, the Supreme Court of Wisconsin considered a mortgage stay law enacted by the general laws of 1858 prior to the passage of this law. The foreclosure of a mortgage by action was subjected to all the ordinary rules and regularities of other actions in courts in that state. The defendant had to answer the complaint within 20 days after the service of the complaint upon him. Judgment followed in the usual course of proceeding, and, by rule and practice of court, the mortgaged premises were sold on six weeks' advertisement. In that case it appears from the facts as stated in the opinion that the defendant defaulted in the payment of principal, and payment of interest on the bond given to the plaintiff secured by a mortgage, and an action was instituted by service of summons on the defendant to foreclose the mortgage after the making of the mortgage and before commencement of the action. "The Mortgage Stay Law" provided, in part, as follows:

"In all actions and proceedings at law thereafter commenced under that portion of chapter 34 of the Revised Statutes of 1849, entitled, 'of the powers and proceedings of courts in chancery on bills for the foreclosure or satisfaction of mortgages,' the defendant or defendants in such actions or proceedings should have six months' time to answer the bill of complaint filed therein after service of summons or publication of notice, as then required by law; and that no default should be entered in any such action, until after the expiration of such time, any law to the contrary notwithstanding."

Judgment was rendered against said defendant before the expiration of six months after service had been made of the summons. Defendant appealed from said judgment, because judgment by default was entered against him before the expiration of six months after service upon him of the summons. Defendant claimed the right not to answer the complaint because the mortgaged premises were ordered to be sold upon six weeks' instead of six months' notice as provided by the Act of 1858. It was contended that the act was unconstitutional and void because it violated the first subdivision of section 10, article 1 of the Constitution of the United States, and section 12 of the first article of the Constitution of the state of Wisconsin, which prohibited the passing of any law impairing the obligation of contracts. The mortgagee in that case contended that when he took the mort-

gage, he had a right in case of default in the payment of the mortgage to use the regular course of judicial proceedings to procure a sale of the mortgaged premises to satisfy his claim of indebtedness. In the argument it was also contended as follows:

"The law professes to take a certain class of contracts, and among them this respondent's mortgage, out of the usual, ordinary and regular course of judicial proceedings, and gives the defendant or defendants six months' time to answer. The Legislature, in enacting the law, did not even trouble themselves to prescribe a change in the summons, which, as in all other cases, yet requires the defendant to answer within 20 days. The class of cases thus taken out of the usual course giving the defendant nine times the time to prepare and put in an answer, that he has in all other cases, is the class of cases in which practically the fewest answers are ever received. In all other litigated matters, no matter how complicated or important, the defendant has to answer within 20 days; here, where there exists hardly ever any defense, he shall have six months to prepare and serve an answer. * * *

"It clearly appears from the face of this law, from every line in it, as plainly as if it had been there written in words, that its only object was to give an additional indulgence to the debtor, an additional delay to the creditor, to reach that indirectly which could not be reached in a direct way, to impair the obligation of all mortgage contracts then in existence by giving time to the defaulting debtors. * * *"

The court held that the act was valid, and that it did not violate the provisions of the Constitution of the United States nor any provisions of the Constitution of Wisconsin which provided that no laws shall be passed impairing the obligation of contracts.

In the third, fourth, and fifth paragraphs of the syllabus, it was said:

"The Legislature may alter or vary existing remedies as they please, provided that in so doing their nature and extent is not so changed as materially to impair the rights and interests of the parties (Knox v. Hundhausen, 23 Wis. 508; and 24 Id. 196).

"By the Act of the 15th of May, 1858, the remedy of mortgagees, as it previously existed, is substantially continued. No new conditions are engrafted on the remedy, the form and mode of proceedings in the action, the nature and extent of the judgment, and the rights under it are the same as before, except only in the matter of the time which is required for these purposes; and that such a change does not infringe or materially impair the obligation of the contract.

"The Legislature may regulate at pleasure the modes of proceeding in the courts in relation to past contracts as well as future ones. It may limit or extend the time for answering, or taking any other step in an action in the courts. The only limit or qualification to this power is, that the Legislature must confine their action within the bounds of reason and justice, and not so prolong the time in which legal proceedings are to be had, as to render them futile and useless in the hands of the creditor, or to seriously impair his rights or securities (Hasbrouck v. Shipman, 16 Wis. 296).

"Although changes in remedies are in general unwise and unjust, yet if for any cause the public good demands a relaxation of them, it becomes the duty of the Legislature, by proper and reasonable modifications, so to change them as to meet the wants of community and afford the relief which the public good demands."

The court, in the body of the opinion, said:

"* * * The remedy of the mortgagee, as it previously existed, is in all its parts substantially continued.

"No new conditions are engrafted. The form and mode of proceeding in his action, the nature and extent of his judgment, and of his rights under it remain the very same. It can be carried into as full and complete execution as at any former period. No clogs or impediments are thrown in the way, either of obtaining or finally executing the judgment, except in the matter of the time which is required for those purposes. * * *

"A complete and substantial remedy was left them, according to the course of justice, as it was administered before its passage, the only difference being that it was less expeditious, but not so much so as materially to affect or diminish their rights. All must admit, I think, that its unconstitutionality is doubtful, and in such cases it is a well-settled rule of courts to resolve doubts in favor of * * * the laws."

The Supreme Court of Nebraska, in the case of Jones v. Davis, 6 Neb. 33, considered the confirmation of a sale of real estate by a sheriff under a decree of foreclosure. It appears that, after the mortgage was executed and default made, a suit was prosecuted to final decree before the passage of a Legislative enactment which provided a more equitable appraisement of property under judicial sale. At the time the contract was made, the law allowed sales of this character to be had for two-thirds of the appraised value. It was contended that this law was a part of the contract entered into between the mortgagor and mortgagee. The decree directed lands to be appraised, advertised, and sold as directed by law. At

the time of the sale, the Legislature had enacted a law directing that all liens and incumbrances were to be deducted from the appraised value, and the sale to take place for two-thirds of the remaining sum.

It was insisted that this subsequent Legislative enactment was obnoxious to the provisions of the Constitution of that state, as well as the provisions of section 10, article 1, of the Constitution of the United States, in that it impaired the obligation of the mortgage contract. The Supreme Court of Nebraska said:

"But it is further contended that the act in question violates both the Constitution of this state and the Constitution of the United States in this, that it has the effect to impair the obligation of the contract. It is true that the act was passed after the execution of the mortgage; and it is also true that it materially changes the mode of ascertaining the value of the property prior to its sale. Under the law as it stood when the contract was executed the appraisement was required to be made regardless of any incumbrances that might be resting upon it, and the sale must have been for at least two-thirds of the value of the property thus ascertained, while now, the sheriff is directed to ascertain all incumbrances of record, and, after deducting them, to return the remainder as the real value for the purposes of the sale. This we regard as in no sense impairing the obligation of the contract, but merely as a change of the remedy or mode of enforcing the contract, which is clearly within the control of the Legislature. Morse v. Gould, 1 Kern. 281; Von Baumbach v. Bade, 9 Wis. 559; Walter v. Bacon, 8 Mass. 468."

The Supreme Court of the United States in the case of Crane v. Hahlo et al., 258 U. S. 142, 42 Sup. Ct. 214, in speaking of vested right in reference to any given mode of procedure, said:

"No one has a vested right in any given mode of procedure (Railroad Co. v. Grant, 98 U. S. 398, 401, 25 L. Ed. 231; Gwin v. United States, 184 U. S. 669, 674, 22 Sup. Ct. 526, 46 L. Ed. 741), and so long as a substantial and efficient remedy remains or is provided, due process of law is not denied by a legislative change. (Oshkosh Waterworks Co. v. Oshkosh, 187 U. S. 437, 439, 23 Sup. Ct. 234, 47 L. Ed. 249)."

In the case of Kerckhoff-Cuzner M. & L. Co. v. Olmstead, 85 Cal. 80, 24 P. 648, the Supreme Court of California considered an enactment by the Legislature amending a former section of the Code of Civil Procedure wherein the amendment added that cessation from labor for 30 days on an unfinished building "shall be deemed equivalent to completion. * * *

"We do not think that the amendment, when applied to the case in hand, is retroactive in effect. It is true it shortened the time which the respondent would otherwise have had to file its claim, and thus seek its remedy. But the authorities are numerous to the effect that a change of remedy, or in the time within which it must be sought, does not impair the obligation of a contract, provided an adequate and available remedy be left. Thus it has been held that an enactment reducing the time prescribed by the statute of limitations in force when the right of action accrued is not unconstitutional, provided a reasonable time be given for the commencement of an action before the bar takes effect. Terry v. Anderson, 95 U. S. 628. In that case the court, by Waite, C. J., said· 'The parties to a contract have no more a vested interest in a particular limitation which has been fixed than they have in an unrestricted right to sue. They have no more a vested interest in the time for the commencement of an action than they have in the form of the action to be commenced; and as to the forms of action or modes of remedy, it is well settled that the Legislature may change them at its discretion, provided adequate means of enforcing the right remains.'"

If plaintiff could not have an unrestricted right to sue, and a vested interest in the time for the commencement of an action for the foreclosure of a mortgagee, how can it be said that plaintiff has a vested right in requiring a defendant whom plaintiff alleges has defaulted in the payment of a note and mortgage to answer his petition within 20 days from the date of service of summons upon the defendant, so long as adequate means of enforcing his remedy remains.

In Potter, Dwarr, Stat. page 471, this language is used:

"But it is well-established law that the individual citizen, with all his rights to protection, has no vested right in what is known in the law as remedies, nor in any particular existing remedy. He has no such vested interest in the existing laws of the state as precludes their amendment or repeal by the Legislature, nor is there any implied obligation on the part of the state to protect its citizens against incidental injury occasioned by changes in the law. * * * If the remedy does not impair the right of property itself, if it still leaves the party a substantial remedy according to the course of justice as the right existed at the time of the passage of the statute, it does not impair the obligation of the contract, nor will it be held to do so merely because the new remedy is less efficient, less speedy, or less convenient than the old one."

See, also, Lewis' Sutherland on Stat.

Const. (2d Ed.) sec. 284; People ex rel. Foote v. Clark, 283 Ill. 221, 119 N. E. 329; Milbourne v. Kelly, 93 Kan. 753, 145 P. 816; Keith v. Keith, 26 Kan. 26; Shepard v. Gibson, 88 Kan. 305, 128 P. 371; Boucofski v. Jacobsen, 36 Utah, 165, 104 P. 117; Kring v. State of Missouri, 107 U. S. 221, 27 L. Ed. 506; Endlich, Interpretation of Statutes, p. 387; Black, Constr. & Interpretation of Laws, page 265; Cooley, Const. Lim. p. 326; Hewitt Logging Co. v. Northern Pacific Ry. Co., 97 Wash. 597, 166 P. 1153, 3 A. L. R. 198; and Frary v. Roxana Petroleum Corp. (Kan.) 297 P. 668.

The majority opinion in the case of Osage County Savings & Loan Ass'n v. Worten (No. 24681), supra, construes the act in question as violating the provisions of section 54, article 5, of the Constitution of Oklahoma. In my opinion this section of the Constitution has no application to the provisions of the Moratorium Law. The Moratorium Law does not repeal any statute. At least no statute has been pointed out by the majority opinion.

In the case of State ex rel. West v. McCafferty, 25 Okla. 2, 105 P. 992, this court considered an express amendment to another section of the statute. In that case the court held, in an original proceeding in mandamus involving a tax ferret contract with the board of county commissioners, that "where a section, expressly amendatory to another section of a statute, purports to set out in full all that it is intended to contain, any matter which was in the original section, but not in the amendatory section, is repealed by the omission." The main question for determination was whether the act approved May 29, 1908, was repealed in whole or in part by the act approved March 8, 1909 (Laws 1909, p. 626, ch. 38, art. 3), and if so, what effect said repealing act had on said contract of employment by the county commissioners with the tax ferret. In that case the court in discussing the term proceedings said that proceedings mean "All steps or measures adopted in the prosecution or defense of an action."

In the case of Claussen v. Chappin, Sheriff, et al., 221 Pac. 1073, the Supreme Court of Montana held that "The term 'proceeding,' in its general use, comprehends every step taken or measure adopted in prosecution or defense of an action," and as used in Rev. Codes, 1921, sec. 9187, authorizing amendments of any pleading or proceeding in furtherance of justice, contemplates every paper which may be properly employed in an action other than the plead-

ings. In the body of the opinion the court said:

"While in its more general sense the term 'proceeding' comprehends every step taken or measure adopted in the prosecution or defense of an action (State ex rel. West v. McCafferty, 25 Okla. 2, 105 P. 992, L. R. A. 1915A, 639; Sherman v. Southern Pac. Co., 31 Nev. 285, 102 P. 257; 3 Words and Phrases, Second Series, 1233), in the more restricted sense in which it is used in section 9187, it refers to every paper which may be employed properly in an action, other than the pleadings. Wilson v. Allen, 3 How. Pr. (N. Y.) 369; Hopewell v. State, 22 Ind. App. 489, 54 N. E. 127; Johnson v. Jones, 2 Neb. 126.

"In State ex rel. Nissler v. Donlan, 32 Mont. 256, 80 P. 244, this court said: 'A motion is but a step in a case, or proceeding in a case'."

Our Constitution provides that the repeal of a statute shall not affect proceedings begun. This language is not synonymous with the statement that the repeal of a statute shall not change the procedure in a proceeding pending. Procedure is not synonymous with the term "proceeding" or "proceedings." It is my theory that no litigant has any vested right in procedure or in any particular remedy when the same does not substantially affect the obligation of any contract or the substantial rights of the parties. See Youst et al. v. Willis & Bradford, 5 Okla. 413, 49 P. 1014; Independent Cotton Oil Co. v. Beacham, 31 Okla. 384, 120 P. 969; American National Ins. Co. v. Donahue, 54 Okla. 294, 153 P. 819; Adams v. Iten Biscuit Co., 63 Okla. 52, 162 P. 938; Shelby Downard Asphalt Co. v. Enyart, 67 Okla. 237, 170 P. 708; Fry v. Wolf, 106 Okla. 289, 234 P. 191; and Billy v. Burnett, 137 Okla. 175, 278 P. 637.

In Ensley v. State, 4 Okla. Cr. 49, 109 P. 250, the Criminal Court of Appeals, speaking through Mr. Justice Richardson, held:

"Section 54 of article 5 of the Constitution of Oklahoma, providing that the repeal of a statute shall not 'affect any accrued right; or penalty incurred, or proceedings begun by virtue of such repealed statute,' has no reference to changes in the law of procedure merely."

The many able counsel in their exhaustive briefs in their search for offending constitutional clauses did not present section 54, article 5 of the state Constitution. The sections applicable presented in their brief were section 57, article 5; section 6, article 2; and section 15, article 2 of the Constitution of Oklahoma, and section 10 of ar-

ticle 1 of the Constitution of the United States.

As I view this legislative enactment, it deals only with the remedy provided for the enforcement of the right of the mortgagee. When the mortgagor defaults, then the mortgagee has no way of collecting the indebtedness due him on the defaulted note except the remedy provided by law. The remedy is to institute an action in foreclosure. A petition is filed. A summons is issued and the same statute which authorizes the filing of the action to enforce his remedy also grants to the defendant, the defaulting mortgagor or his assigns, the right to file an answer to contest the action of the plaintiff. The statutes prior to the enactment of the Moratorium Act granted the defendant in a foreclosure action 20 days after the date on which summons was returnable to file a demurrer or answer. There is no provision in the statute which prohibits the court from enlarging this time within which to file an answer; on the contrary, section 218, O. S. 1931, specifically provides for such enlargement. In an answer the defendant may interpose his defenses, including set-offs and counterclaims. These are all statutory provisions which authorize the seeking of the relief by the mortgagee. There is no vested right in these subsequent steps in the proceedings after the institution of an action seeking to obtain remedial relief. The change from 20 days to nine months is only a change in the successive steps in the procedure to obtain the remedy provided by law, the remedy being enforced by a compulsory process by reason of the fact that the mortgagee is unable to obtain voluntarily the relief he is entitled to have.

The whole sense and import of the Moratorium Law is that the courts were directed to enlarge upon the answer date in foreclosure proceedings. By reason of the general commotion existing by virtue of the economic depression, the Legislature sought to apply a uniform rule to steps in foreclosure actions so that all persons, temporarily at least, might have an opportunity to stay an enforced sale of secured real property in the hope that economic conditions would readjust themselves, whereby real property given as security for an indebtedness might be offered for sale and command a price commensurate with former values in order to liquidate the secured indebtedness, and thereby secure to the people of the state a more wholesome condition and a better sense of tranquility. Courts will not and should not overthrow acts of the legislative body in the exercise

of its police power unless it clearly appears that this determination has been arbitrarily or unreasonably exercised. Ex parte Nash (Nev.) 26 P. (2d) 353.

In the instant case, it is my opinion that no substantial rights have been interfered with, no contractual obligations have been impaired, and no destruction of any rights granted by state or federal Constitutions have been offended; that the act should be upheld.

I am authorized to state that Mr. Justice SWINDALL and Mr. Justice OSBORN concur in the views herein expressed.

Since reading the above and foregoing views to the conference of this court, January 8, 1934, the day that the Chief Justice of the United States delivered the Blaisdell opinion, supra, an official copy of the Blaisdell opinion has been received, and this court has delivered a supplemental opinion on rehearing.

It is my judgment that the majority opinion and the supplemental opinion can find no shelter under the opinion of Mr. Chief Justice Hughes. The same broad principles involved in the Minnesota case are present in the Oklahoma Moratorium Law. In the Blaisdell Case the Minnesota mortgage moratorium was questioned as being repugnant to the contract clause, article 1, section 10, and the due process and equal protection clauses of the Fourteenth Amendment of the federal Constitution. In the Blaisdell opinion it is said:

"The state court upheld the statute as an emergency measure. Although conceding that the obligations of the mortgage contract were impaired, the court decided that what it thus described as an impairment was, notwithstanding the contract clause of the federal Constitution, within the police power of the state as that power was called into exercise by the public economic emergency which the Legislature had found to exist."

Mr. Chief Justice Hughes specifically held that the Minnesota Moratorium Law "does not impair the integrity of mortgage indebtedness." In the body of the opinion he said:

"The argument is pressed that in the cases we have cited the obligation of contracts was affected only incidentally. This argument proceeds upon a misconception. The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end."

238

On this question the Chief Justice said:

"Whatever doubt there may have been that the protective power of the state, its police power, may be exercised—without violating the true intent of the provision of the federal Constitution—in directly preventing the immediate and literal enforcement of contractual obligations by a temporary and conditional restraint, where vital public interests would otherwise suffer, was removed by our decisions relating to the enforcement of provisions of leases during a period of scarcity of housing. Block v. Hirsh, 256 U. S. 135; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170; Edgar A. Levy Leasing Co. v. Siegel, 256 U. S. 242."

This language is a direct answer to the holding of the majority of the court on our Moratorium Law. Mr. Chief Justice Hughes also said:

"It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends. Chastleton Corporation v. Sinclair, 264 U. S. 543, 547, 548. * * *

"We are of the opinion that the Minnesota statute as here applied does not violate the contract clause of the federal Constitution. Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned.

"What has been said on that point is also applicable to the contention presented under the due process clause. Block v. Hirsh, supra.

"Nor do we think that the statute denies to the appellant the equal protection of the laws. The classification which the statute makes cannot be said to be an arbitrary one. Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283; Clark v. Titusville, 184 U. S. 329; Quong Wing v. Kirkendall. 223 U. S. 59; Ohio Oil Co. v. Conway, 281 U. S. 146; Sproles v. Binford, 286 U. S. 374."